IN THE MATTER OF RICHARD D. BARKER, AN ATTORNEY AT LAW.

Argued February 27, 1989—Decided April 28, 1989.

*Robyn M. Hill,* Acting Chief Counsel, Disciplinary Review Board, argued the cause on behalf of Office of Attorney Ethics.

*Richard D. Barker* argued the cause *pro se.*

PER CURIAM.

This disciplinary proceeding arises out of the determination of the Disciplinary Review Board (DRB) to treat as a present-ment, the recommendation of the District XIV Ethics Commit-tee for Mercer County (the Ethics Committee) that respondent be privately reprimanded. The Disciplinary Review Board unanimously agreed with the Ethics Committee's findings of unethical conduct but was unable to agree on the appropriate discipline. A majority of the DRB recommended that respon-dent be suspended from the practice of law for six months, one member of the DRB recommended that respondent be suspend-ed from the practice of law for one year, and two members of the DRB recommended that respondent be publicly reprimand-ed. Our independent review of the record leads us to conclude that respondent has been guilty of unethical conduct but that a public reprimand is the more appropriate discipline.

I

Respondent was admitted to the bar in 1975. During the period in question respondent was a sole practitioner with a general practice, most of which was in real estate.[1] On April 30, 1985, a trust account check in the amount of $2,195.00 to Weichert Realty was returned for insufficient funds. The bank forwarded the overdraft notice to the Office of Attorney Ethics (OAE), which conducted an audit of respondent's books and

---

[1]Currently, respondent is an attorney with Middlesex County Legal Services Corp.

records. The audit examination encompassed respondent's records for the period from January 1984 through June 1986.

The audit led the OAE to file a complaint against respondent that charged him with six counts of ethical violations, including failure to maintain required records, failure to safeguard client funds, misappropriation relating to a personal real estate transaction, and other allegations of misappropriation of client funds.

The most serious charge against respondent is that he misappropriated client funds to purchase his home. As found by the DRB, the facts with respect to this allegation are:

"On April 2, 1985 respondent closed title on his residence. He had obtained a mortgage loan in the amount of $45,300.00. The additional cash required at closing amounted to approximately $7,700. Respondent intended to make up the shortfall by utilizing $3,500.00 from his personal funds and the remainder from a fee which he had earned in the *McCarren* matter. On the closing date, respondent requested his bookkeeper to advise him of the exact balance of the *McCarren* fee and to transfer it to the "Barker account." He was informed by his bookkeeper that the *McCarren* balance consisted of $5,324.23. Adding this sum to the above personal funds of $3,500.00, respondent would have had in excess of $8,800.00, more than what was required to cover the $7,700.00 difference between his mortgage loan and the total closing costs.

It was respondent's intention to write a check against his trust account in the amount of $45,300.00, to be covered by the mortgage proceeds check in his possession. Following the closing, that check was to be deposited into his trust account. He intended to write, also, a personal check for the additional monies needed to close title. Sellers' attorney, however, refused to accept respondent's personal check, which was not certified. Respondent then drew the additional funds from his trust account, into which he intended to deposit, after the closing, an equivalent check from his personal account. On April 10, 1985, respondent deposited $3,500.00 into his trust account.

As respondent testified and the auditor concurred, under normal circumstances, there would have been sufficient funds on hand to cover the total amount needed at closing. After the closing, however, certain circumstances came to light which led to the return of the Weichert check.

As the audit disclosed, the balance in the *McCarren* fee was not $5,324.23, as the bookkeeper erroneously advised respondent, but $3,389.79. This $1,934.44 shortfall ultimately caused the return of the Weichert check and the invasion of other clients' funds, namely the Engs.

Respondent testified that he was unaware of the correct balance of the *McCarren* fee owed to him, having relied on the bookkeeper's statement and having failed to examine the *McCarren* ledger card to determine the exact balance. Pursuant to testimony, even if respondent had reviewed the ledger

card, he would not have been able to determine that the accurate balance was $3,389.79, not $5,324.23, in view of the bookkeeper's failure to reconcile the trust account with the ledger cards on a regular basis. Respondent's own accountant testified that, on the date of the closing, April 2, 1985, the *McCarren* ledger showed a balance of $5,324.23. Only after the later reconciliations undertaken separately by respondent's new bookkeeper, the auditor and respondent's accountant, did it become possible to determine that the actual balance of the fee was $3,389.79.

Upon being notified that the Weichert check had been dishonored, respondent deposited $3,500.00 into the trust account on May 28, 1987. He testified that he was unaware of the source of the shortage. In reviewing the history of the account with his bookkeeper, she too was unable to determine the reason therefor. No client complained or was financially injured as a result of the trust account shortage. Respondent testified that all checks issued from his trust account had been honored when presented for payment. Nevertheless, the July 1985 reconciliations, submitted by respondent to the auditor in July 1986, showed a negative balance of $2,187.76. Moreover, the return of the Weichert check indicated that, at least for a period of time, the account was out of trust."

[Footnotes omitted]

Additionally, in August of 1986, the auditor informed respondent that according to his calculations, there was a $7,000.00 shortage in the trust account. Respondent then deposited $8,000.00 into the account until the source of the shortage could be identified or the problem otherwise rectified through a reconciliation.

The facts with respect to the alleged $7,000 shortage are unclear. It is agreed, however, that checks issued in connection with the purchase by respondent's client, Mr. Eng, of three condominiums were returned for new signatures. Initially, the OAE auditor thought that these checks had not been paid prior to their return, and consequently the monies set aside to cover them should still be in the trust account. Further investigation established that the checks had been honored on their initial presentation. Accordingly, the auditor may well have been mistaken in his belief that the trust account was out of balance by $7,000. At the very least, the record is ambiguous and certainly does not establish clearly and convincingly that respondent's trust account was out of balance by $7,000.

## II

Knowing misappropriation of client funds "consists simply of a lawyer taking a client's money entrusted to him knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 159–60 (1986). Both the Ethics Committee and the DRB concluded that respondent was not guilty of knowing misappropriation. Our independent review of the record likewise leads us to find no evidence that respondent knowingly misappropriated any client funds. With respect to the real estate transaction, we find first that respondent did not intend to cover his $3,500 shortfall at the closing with checks issued against his trust account. He did so only because the other attorney refused to accept his personal check. Moreover, when he did so, he believed that there were sufficient fees in the account belonging to him so as not to require the use of any of his client's funds. Both respondent's accountant and the OAE auditor testified that a review of the *McCarren* ledger card on April 2, 1985, the date of respondent's closing, would have reasonably led anyone to believe that the balance in that account approximated $5,324.23. Only after the return of the Weichert check, issued in connection with a different transaction, did respondent discover a trust account shortage, although unaware of its source. And it was only following the reconciliations performed by his new bookkeeper and the auditor that respondent learned that the shortage was the result of an erroneous balance being allocated to the *McCarren* fee of $5,324.23, rather than $3,389.79. At the time of the closing respondent reasonably assumed, therefore, that the balance in the account was $5,324.23.

Both the Ethics Committee and the DRB found that respondent was grossly negligent in his accounting procedures. Specifically, the Ethics Committee concluded:

> Respondent is guilty of maintaining inadequate and incorrect records of his trust accounts. It appears that respondent did not reconcile said accounts on a timely basis, and that, in general, respondent's trust accounts were maintained in a sloppy manner and were not overviewed by him to a responsible degree.

The panel further finds that the respondent's drafting of checks from his trust account in excess of the funds deposited thereto at the time of his personal real estate transaction, constitutes a gross mishandling of said account....

The DRB also found that respondent "exhibited gross negligence in his accounting procedures. Respondent failed to exercise proper supervision over his bookkeeper so as to ensure that regular reconciliations were being performed, as mandated by *R.* 1:21–6(b)(8)." The DRB also found that "this 'shoddy bookkeeping' caused an inadvertent invasion of clients' funds when respondent drew against insufficient funds in the *McCarren* account. Said invasion, however, was the fruit of improvidence, ignorance or neglect, not of knowledge."

Our review of the record leads us to agree with the Ethics Committee and the DRB that although respondent was not guilty of knowing misappropriation, he was grossly negligent in his accounting procedures. Respondent's problems result primarily from a very inadequate bookkeeping system, specifically, the combination of an incompetent part-time bookkeeper and respondent's failure properly to supervise her work. Respondent employed a part-time bookkeeper, who was to maintain a "one-write bookkeeping system." Under that bookkeeping system each transaction is to be recorded in a cash-receipt and cash-disbursement journal as well as on the individual client ledger card. If these accounts are properly maintained and reconciled on a quarterly basis, an attorney should be able to make a precise allocation of the balance in the trust account to the funds belonging to each client.

Although respondent's part-time bookkeeper maintained the individual ledger cards, she did not regularly reconcile the balance in the trust account with the individual client ledger cards. This failure to reconcile the accounts made it difficult, if not impossible, to determine the balance in the trust account belonging to each client.

Nonetheless, it is well-established that an attorney has the ultimate responsibility for maintaining proper trust accounts. "Lawyers have a duty to assure their accounting

practices are sufficient to prevent misappropriation of trust funds." *In re Fleischer*, 102 *N.J.* 440, 447 (1986). An attorney cannot avoid this responsibility by claiming reliance on his or her staff. Respondent totally failed to exercise any reasonable supervision over his part-time bookkeeper. Even a cursory review of the trust records would have established, as he himself testified, that his "books were in such a horrendous state because [he] wasn't sure what the hell Kitty [the bookkeeper] had done."

Nevertheless, this is not a case like *Fleischer*, where the attorneys intentionally used a bookkeeping system to shield their misappropriations. Respondent's acts resulted primarily from "inept office administration." Instead, we find that respondent's actions are most similar to those of the respondent in *In the Matter of Hennessy*, 93 *N.J.* 358, 360 (1983) (attorney who experienced relatively minor shortages in his trust account which were "not attributable to any client" was not guilty of misappropriation but was publicly reprimanded for his "flagrant recordkeeping errors combined with an apparent lack of comprehension of the proper operation of an attorneys' accounts."), and *In the Matter of Fucetola*, 101 *N.J.* 5 (1985) (attorney who acknowledged that his recordkeeping was inadequate resulting in his trust account being overdrawn at various times, and his issuing trust checks against uncollected funds and in excess of available funds standing to the credit of the client was subject to public reprimand).

*In the Matter of James*, 112 *N.J.* 580 (1988), is also relevant. There the respondent misunderstood the purposes of his trust account for twenty-four years. He used his trust account as a second business account, and used clients' trust-account funds to advance costs to other clients and to pay litigation expenses and payroll taxes, resulting in his trust accounts being "out of trust." In *James*, as in this case, we found no injury to clients, a subsequent correction of the problems, and no evidence that the attorney knowingly misappropriated client funds or intentionally used a bookkeeping system to prevent him from know-

ing whether he used client funds. We suspended James from the practice of law for three months. Like James', respondent's conduct was grossly negligent. Nonetheless, it was in no way as egregious. James' conduct spanned several years and resulted in numerous ethical transgressions.

■ The Ethics Committee recommended that respondent receive a private reprimand. The majority of the DRB recommended suspension from the practice of law for six months. In reaching this conclusion, the DRB considered that respondent previously had received a private reprimand on September 15, 1982, for practicing law under the designation "The Budget Barrister, a Professional Corporation." Because respondent's prior infraction was of a technical nature in an evolving area of legal practice, lawyer advertising, and unrelated to respondent's current infractions, we deem it to be of slight significance in determining the appropriate discipline to be imposed on respondent in this matter.

In determining the appropriate discipline to be imposed, we considered the following: (1) no client was financially injured; (2) respondent immediately covered the shortage with his personal funds; (3) the bookkeeping error was an isolated event; (4) there was no pattern of a failure to safeguard clients' funds; (5) respondent immediately engaged an experienced full-time bookkeeper; (6) he implemented the new bookkeeping system the auditor recommended; and (7) his records for the past three years appear to be kept in compliance with the directives of *Rule* 1:21–6(b)(8).

Accordingly, we find respondent violated R.P.C. 1.15(a), by failing to maintain required records and safeguarding client funds, but not R.P.C. 8.4(c), and conclude that the appropriate discipline is a public reprimand.

We direct that respondent reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For public reprimand*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*–None.

## ORDER

It is ORDERED that RICHARD D. BARKER of TRENTON, who was admitted to the bar in 1975, be publicly reprimanded for his violation of *R.P.C.* 1.15(a) by failing to maintain required records and safeguarding client funds; and it is further

ORDERED that RICHARD D. BARKER reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.