IN THE MATTER OF JAMES J. GALLO, AN
ATTORNEY AT LAW.

Argued September 12, 1989—Decided December 15, 1989.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Jan K. Seigel* argued the cause for respondent.

PER CURIAM.

This disciplinary proceeding arose from a random compliance audit of respondent's trust account. As a result of the audit, the Office of Attorney Ethics (OAE) filed a complaint charging respondent with a number of ethical infractions. The charges included failure to maintain required records, payment of personal expenses from the attorney's trust account, depositing personal funds into the trust account to replace client funds improperly used to pay business expenses, depositing the trust funds of a client into respondent's business account, failure to safeguard client funds, misappropriation of client funds, and commingling personal funds with trust funds.

The District VI Ethics Committee (Ethics Committee or Committee) conducted a hearing on the allegations. The Committee found that respondent had violated *DR* 9-102(A), (B), and (C)[1] (among other things, requiring attorneys to maintain, identify and segregate client funds, and to comply with record-keeping

---

[1]These references are to the Disciplinary Rules that governed the conduct of attorneys at the time of these occurrences. American Bar Association, *Code of Professional Responsibility* (1969). The Rules of Professional Conduct, effective September 10, 1984, contain provisions similar to those of the Disciplinary Rules and govern such conduct today.

requirements) and recommended public discipline. The Ethics Committee did not, however, find clear and convincing evidence of a violation of *DR* 1–102A(4) and (6) (proscribing attorney conduct that involves dishonesty, fraud, deceit, or misrepresentation, or that otherwise adversely reflects on a lawyer's fitness to practice law). It consequently dismissed those charges. In addition, the Ethics Committee concluded that respondent had not intentionally used clients' funds and that "respondent's conduct was the result of his inexperience, the bad example of his preceptor, and the enormous pressure of the practice to which he fell heir."

Reviewing the Ethics Committee's presentment, the Disciplinary Review Board (DRB) found respondent guilty of unethical conduct for his record-keeping derelictions, failure to safeguard and segregate client funds, and misappropriation of funds. The DRB held that respondent had not knowingly misappropriated trust-account funds. Although the DRB unanimously found that the ethical infractions warranted public discipline, it was divided on the appropriate punishment: the four-member majority concluded that a one-year suspension was proper, while the three-member dissent recommended a public reprimand. Our independent review of the record leads us to conclude that a three-month suspension is the appropriate discipline.

## I.

Respondent was graduated from the University of Temple Law School in 1977. Soon after being admitted to practice law in this state in December 1978, respondent formed a professional relationship with a Hudson County attorney. Characterizing his status as that of an independent contractor, respondent submitted weekly bills to the attorney for services rendered and received paychecks drawn on the attorney's trust account. That attorney apparently paid all of his operating expenses, including respondent's salary, from his trust account. Respondent testified that he had assumed his mentor's bookkeeping

methodology was an appropriate way for an attorney to maintain records.

In 1980, respondent learned that another attorney in his building intended to retire. After brief discussions on a Friday afternoon, respondent agreed to take over the attorney's practice beginning the following Monday. The retiring attorney left the country abruptly.

According to respondent, the practice included over 200 files that were in a state of complete disarray. Respondent had to file numerous motions to reinstate complaints because his predecessor had failed to answer interrogatories. Respondent testified that there was no filing system, that mail had been left stacked in foot-high piles, and that there was no transition period between the retiring lawyer's departure and respondent's assumption of responsibility.

Respondent did not hire an accountant because of the limited cash flow his practice generated. Whatever record-keeping practices respondent used mirrored those of his prior employer. Consistent with his prior experience, respondent created two bank accounts: a trust account from which he paid all his business expenses, such as salaries, rent, and supplies, and a business account, from which he paid personal expenses, such as credit cards and student loans. Settlement checks were deposited in the trust account. After clients received payment, respondent left his fees in the trust account and used that account to pay various business expenses. Because he never kept a running balance of the trust account and never used client ledger cards, respondent never knew exactly how much money was in the account or precisely whose money it was. Respondent occasionally deposited his own funds into the trust account if he believed that its balance was too low to permit payment of operating expenses. Nonetheless, two checks drawn on the trust account were returned for insufficient funds when clients presented them for payment. In both cases,

however, the checks cleared when presented for payment a second time.

The random audit of respondent's books and records disclosed the following deficiencies, which are set forth in the DRB's Decision and Recommendation:

### Failure to Maintain Required Records

Respondent failed to maintain receipts and disbursement journals for his trust account, failed to maintain a separate trust ledger for each client, and failed to reflect all transactions on client ledger sheets. In addition, almost every check written by respondent to pay his business expenses had been drawn on trust account funds. Respondent was unable to identify numerous deposit tickets for funds deposited into his trust account and unable to produce trust account records or case files prior to January 1, 1984. Respondent attributed his misuse of trust funds to a lack of "finances to pay a bookkeeper or accountant" and in part to "laziness," because it was simpler to pay all checks from the trust account.

### Vittarino Matter

In February 1984, respondent deposited $5,500 into his trust account in behalf of a personal injury client, Arlindo Vittarino. Subsequently, a $4,500 trust account check payable to Mr. Vittarino was returned for insufficient funds. Although the check was honored after a second presentment to the bank in March 1984, it caused respondent's trust account to be overdrawn by $18.74.

Respondent invaded Mr. Vittarino's funds when he issued two trust account checks to his brother-in-law in an unrelated legal matter.

### Burke Matter

On July 18, 1984, respondent deposited $9,000 in his trust account in behalf of a client, the Estate of Jean Burke. The Burke funds were used to cover a $3,418.96 shortage in another matter. Bank statements from September 4 through December 13, 1984, revealed that the Burke funds were invaded on eleven different occasions.

Moreover, in order to disburse the $9,000 due to the estate on February 8, 1985, respondent left in his trust account legal fees earned from three matters settled in January 1985. This commingling of legal fees with client funds continued even after the auditor notified him, on January 11, 1985, of a violation of RPC 1.15.

### Iu Matter

On the same day the Burke funds were deposited, July 18, 1984, respondent deposited $3,500 in behalf of another client, Michael Iu. From July 18, 1984,

until the Iu funds were disbursed on October 5, 1984, the trust account balances for the Burke and Iu funds should have totalled $12,500. The balances of respondent's trust account from August 24 through October 4, 1984, however, showed that both the Burke and Iu funds were invaded on an almost daily basis.

## Wolton Matter

On September 14, 1984, respondent deposited $4,000 into his trust account in behalf of a client in a personal injury matter, Louis Wolton. On the same day, respondent issued a trust check payable to Mr. Wolton in the amount of $2,000, which check was paid by the bank. The cashing of the check on the same day that the settlement draft was deposited resulted in the invasion of other clients' funds.

## Paolino Matter

On October 26, 1984, respondent deposited $65,385 into his trust account in behalf of a buyer of real estate, Mr. Paolino. The mortgage payoff funds for Mr. Paolino amounted to $30,507.17. Between October 26 and December 3, 1984, trust account balances for the Paolino and Burke matters should have been $39,507.17. A review of trust account balances pertaining to those two matters, however, disclosed that between November 20 and November 30, 1984, their funds were invaded. On November 30, 1984, respondent's trust account showed a $2,595.23 shortage in connection with the Paolino and Burke matters.

## Warren Matter

On December 7, 1982, respondent deposited client settlement funds of $20,000 into his "business" or personal account. These funds represented a personal injury recovery in behalf of the client, Timothy Warren, but were subject to an $8,000 lien for welfare payments. Mr. Warren's share of the recovery was approximately $6,500. Respondent was fearful that Mr. Warren would waste the award, as he had on one prior occasion. Respondent discussed the situation with both Mr. Warren and his grandmother. They all agreed that respondent should invest $3,000 on Mr. Warren's behalf and pay him interest at the rate of 10% a month. Respondent subsequently commingled $8,000 of Mr. Warren's award with his personal funds contained in an investment account with Prudential Bache. The proofs are unclear why $8,000.00 was deposited and not the agreed sum of $3,000.00. The record before the Board does not support any notion that respondent deposited the increased amount to camouflage a shortfall or other problems with his investment account.

In any event, the investment proved unwise. The investment was ultimately lost because of market fluctuations. Respondent still honored his commitment to pay Mr. Warren 10% a month. When Mr. Warren requested the principal, respondent paid it to him in full.

After a *de novo* review of the entire record, the DRB determined that the respondent's conduct violated *Rule* 1:21–6, *DR* 9–102(B)(3), *DR* 9–102(C), *DR* 9–102(A), *RPC* 1.15, and *DR* 9–102(B)(4). Those disciplinary violations focused on the inadequacy of respondent's record-keeping procedures and the resultant commingling of client funds with his own funds. The DRB concluded, however, that although respondent had been grossly negligent in his approach to record-keeping, he had not knowingly misappropriated client funds.

## II.

At the outset, we reject the OAE's contention that respondent knowingly misappropriated client funds. As we observed in *In re Wilson*, 81 *N.J.* 451 (1979), misappropriation "means any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *Id.* at 455 n. 1. To invoke the automatic-disbarment rule of *Wilson*, the misappropriation must be knowing. *In re Noonan*, 102 *N.J.* 157, 159–60 (1986). Knowing misappropriation of client funds

> consists simply of a lawyer taking a client's money entrusted to him, *knowing that it is the client's money and knowing that the client has not authorized the taking.* It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant: *it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment.* [*Id.* at 160 (emphasis added).]

The Ethics Committee concluded that "[R]espondent's conduct was the result of his inexperience, the bad example of his preceptor, and the enormous pressure of the practice to which he fell heir. We find that there was no intentional use of

clients' funds; rather, in each case the use was inadvertent
* * *." The DRB was also unable to conclude that a knowing
misappropriation had occurred.

In order to find that respondent knowingly misappro-
priated his clients' funds, we must find clear and convincing
evidence of such a misappropriation. *In re Perez,* 104 *N.J.* 316,
324 (1986). The OAE asserts that the evidence in the record
meets the clear-and-convincing standard. First, the OAE ob-
serves that trust-account checks in both the Vittarino and
Warren matters were returned for insufficient funds. As a
result, the OAE claims that respondent knew he had a problem
with his trust account and that he knew client funds were being
spent improperly. Consequently, he knew that an "invasion
[into clients' funds] was a likely result of his conduct." *In re
Skevin,* 104 *N.J.* 476, 486 (1986).

Secondly, the OAE contends that respondent engaged in
various business transactions that demonstrate his business
acumen and contradict respondent's assertion that his igno-
rance of trust-accounting procedures led to his difficulties.
Specifically, the OAE claims that respondent's purchase of
stock on margin and his handling of the estate accounting in
the Burke matter reflect his familiarity with business concerns.
Finally, respondent allegedly admitted to the auditor who con-
ducted his random audit that his operating expenses exceeded
his gross revenues. In our view, this proof does not satisfy the
clear-and-convincing standard of knowing misappropriation.

We are not convinced that the return of two trust-account
checks for insufficient funds shows that respondent knew he
was misappropriating client funds. Those circumstances are
different from those involved in *In re Fleischer,* 102 *N.J.* 440
(1986). There, a trust account was overdrawn on three sepa-
rate occasions, the attorneys admitted to their awareness that
the trust account had lacked sufficient funds, and the three-
member law firm in question intentionally designed a book-
keeping system that prevented them from knowing whether

they were using clients' trust funds. The evidence in this case indicates that respondent never designed his bookkeeping system but rather followed the practices of his prior employer. Also significant are respondent's apparent unfamiliarity with the basic principles concerning administration of a lawyer's trust account and his apparent lack of knowledge concerning the current daily balance in the two accounts he did maintain. Under the circumstances revealed by this record, we cannot find clear and convincing evidence of a knowing misappropriation.

We reemphasize the *Noonan* mandate that knowing misappropriation requires an attorney to take a client's money *knowing* he has no authority to do so. The Ethics Committee and the DRB both found that although a misappropriation occurred, it was not a knowing one. We agree. Having concluded that respondent's conduct does not warrant the automatic disbarment required under *Wilson*, we now consider the appropriate discipline for respondent's numerous violations.

Although respondent did not knowingly misappropriate client funds, we cannot sanction his serious misconduct. Lawyers have a duty to assure that their accounting practices are sufficiently rigorous to prevent misappropriation of trust funds. *In re Fleischer, supra*, 102 *N.J.* at 447. Whether through ignorance or inattentiveness, the accounting procedures in respondent's office at the time of his audit were entirely inadequate. Respondent was unaware of the balance in the trust account on any given day and consequently could not determine whether the money belonged to a client or to himself. Respondent did not withdraw his fees when earned; rather, he commingled his earned income with client funds, making withdrawals when necessary to pay his operating expenses. We emphasize the seriousness of this inadequate accounting methodology and the resultant ethical violations.

We note the settled principle that the primary reason for discipline is not to punish the attorney; rather, it is "to pre-

serve the confidence of the public in the integrity and trustworthiness of lawyers in general." *In re Wilson, supra,* 81 *N.J.* at 456. Yet, at the same time we recognize the significance of mitigating factors that weigh against imposing the harshest sanction available. *See In re Barker,* 115 *N.J.* 30, 37 (1989).

The DRB, by a four-to-three vote, recommended that we order respondent suspended from the practice of law for one year. But "[t]he. severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." *In re Nigohosian,* 88 *N.J.* 308, 315 (1982). In this case, we decline to accept the majority's recommendation. We conclude that a three-month suspension is the appropriate level of discipline.

Respondent's obvious lack of knowledge about the rudimentary principles of an attorney's record-keeping responsibilities and the unfortunate example of egregiously-improper bookkeeping practiced by respondent's first professional employer particularly influence our decision. The chaotic condition of the practice respondent inherited undoubtedly contributed to his record-keeping deficiencies. Although we may take for granted that lawyers entering the practice today are acquainted with the basic principles governing the proper maintenance of attorney trust accounts, respondent apparently "slipped through the cracks" and was unequipped to discharge those important responsibilities.

We have already noted that respondent did not intentionally design his bookkeeping system to prevent himself from knowing whether he was invading client funds. In addition, no client ever suffered financial injury as a result of respondent's ethical violations. Every client was paid in full. Also, respondent has undertaken numerous corrective measures to ensure that his violations do not recur, including hiring an accountant and enrolling in the first available course on trust accounting offered by the New Jersey Institute for Continuing Legal Education. His record-keeping practices now appear to comply

with the requirements of *Rule* 1:21–6. Finally, we note respondent's otherwise unblemished record and acknowledge the testimony at the Ethics Committee hearing of his good character and reputation among members of the bar.

Respondent shall reimburse the Ethics Financial Committee for any administrative costs.

So ordered.

*For Suspension:* Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—none.

### ORDER

It is ORDERED that JAMES J. GALLO of JERSEY CITY who was admitted to the bar of this State in 1978, be suspended from the practice of law for a period of three months effective January 2, 1990, and until the further order of this Court; and it is further

ORDERED that JAMES J. GALLO reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that JAMES J. GALLO be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that JAMES J. GALLO comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.