578 A.2d 1219

IN THE MATTER OF DONALD G. HOWARD, AN
ATTORNEY AT LAW.

Argued February 27, 1990—Decided September 7, 1990.

*Thomas J. McCormick*, First Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Donald G. Howard* argued the cause pro se.

PER CURIAM.

This matter arises from a report of the Disciplinary Review Board (DRB) recommending that respondent, Donald G. Howard, be disbarred. The matter came before the DRB on a presentment filed by the District IIIB Ethics Committee (DEC), charging respondent with misappropriation of client trust funds. Our independent review of the record leads us to conclude that disbarment is the appropriate discipline.

I

Respondent is a sole practitioner who was admitted to the bar in 1968. In August 1987 respondent was experiencing severe financial difficulties. He had failed to pay the real-estate taxes for 1986 and 1987 on his home, the Internal Revenue Service had on several occasions imposed liens on his attorney business account for unpaid withholding taxes, and his attorney business account was frequently overdrawn. Respondent informed an auditor of the Office of Attorney Ethics (OAE) that he owed approximately $150,000 in debts.

His law practice was marginal. As of August 31, 1987, his trust-account balance was only $118.40. From September 1987 through December 1987 respondent made only four deposits to his trust account in excess of $1,000, and those funds were fully disbursed within days of receipt.

Respondent's problems arose from his handling of funds he had received from two unrelated clients, Gerhard Kaufman and Robin Henrie Irving. On September 1, 1987, Gerhard Kaufman gave respondent a personal check in the amount of $15,200. Mr. Kaufman testified at the DEC hearing that respondent was to pay that money to Kaufman's ex-wife, Marie, as part of a final divorce settlement. On September 3, 1987, rather than depositing Kaufman's check in his trust account, respondent deposited Kaufman's check in his *personal* account at the Provident National Bank in Philadelphia, Pennsylvania. Prior to that deposit, the balance in respondent's *personal* account was $20.90. On September 13, 1987, ten days after the deposit of the Kaufman check, respondent had exhausted all but $275.61 of the $15,200 by paying off personal debts, including $6,527.41 for overdue real-estate taxes on his residence and $4,714.53 for mortgage payments on his residence.

The DRB in its Decision and Recommendation succinctly sets forth the facts of the respondent's dealing with his other client, Robin Henrie Irving, as follows:

During this same time period, respondent received $45,000 from Yellow Freight Lines for his client, Robin Henrie Irving, in settlement of a personal injury matter. This check was deposited into respondent's trust account on September 2, 1987. [ ] According to the September 8, 1987 Statement of Account [ ] prepared by respondent and signed by the client, respondent was entitled to a total of $14,000 in fees and costs. The sum of $11,000 was to be held in trust by respondent to cover the estimated amount due on a workers' compensation lien. Mrs. Irving received the balance of $20,000 in two separate checks. The first check, in the amount of $19,500, was given to Mrs. Irving on September 8, 1987. The second and final payment of $500 was made on September 14, 1987. As reflected on respondent's client ledger for Irving, two days after depositing the Irving settlement check, respondent issued two checks to himself as fees, totalling $1,500. Between September 8 and September 19, respondent took an additional $3,700 as fees from the Irving funds. He also diverted $15,200 of these funds to pay Marie Kaufman on September 17, 1987, more than two weeks after he received, deposited in his personal account, and misappropriated the $15,200 in Kaufman funds. Following all of these payments, the balance of Irving funds being held to pay the workers' compensation lien in respondent's trust account was $4,600, or $6,400 less than the $11,000 respondent had agreed to hold in trust to pay the compensation lien. Respondent contended that he had "sufficient equity" in the account to cover the disbursements. No proof of any kind in support of this position was provided.

Additionally, respondent did not pay for sixteen months a worker's compensation lien of $17,761.51 (subsequently compromised to $11,707.67) that Reliance Insurance Company (Reliance) had on the proceeds of Mrs. Irving's personal injury settlement. Respondent was well aware of Reliance's outstanding lien as evidenced by a "Statement of Account" that he had furnished to Mrs. Irving on September 8, 1987. Although Reliance had inquired in writing repeatedly regarding the status of the Irving case (on January 6, 1988, March 30, 1988, and July 18, 1988), respondent failed to reply.

Finally on November 16, 1988, Reliance retained a New Jersey attorney to institute legal action against respondent. Thereafter, respondent agreed to settle the $17,761.51 lien for $11,707.67. In January 1989, respondent paid the compromised lien by drawing a check for $11,000 on his attorney trust account and a check for $707.67 on his business account.

Prior to the September 2, 1987 deposit of the Irving settlement funds of $45,000, respondent only had $118.40 in his trust

account. On October 14, 1987, less than six weeks after the $45,000 deposit, the total funds on deposit in respondent's trust account were $6,891.52. Thereafter, respondent regularly had less than the $11,000 he ultimately disbursed from the account in January 1989 for the Reliance lien on the Irving settlement funds.

Respondent was first audited in the fall of 1987 by an auditor engaged by the OAE at the request of the DEC, which at that time was investigating two other complaints against respondent. Those complaints did not concern any allegations of misappropriation but rather concerned claims of respondent's gross negligence with respect to a worker's compensation claim of his client Leslie Nirdlinger. Because we conclude that respondent should be disbarred for knowing misappropriation, we do not address appropriate discipline that respondent should receive with respect to Niedlinger's claim.

The audit revealed the Kaufman and Irving transactions. When questioned about the Kaufman account, respondent was very evasive. First, he claimed that he had "no recall" of Kaufman, and then claimed it was only a coincidence that the amount of the Kaufman check ($15,200) was the same amount deposited in his personal account. He later informed the auditor that he thought Kaufman had agreed to lend him $15,200. His responses with respect to the Irving matter were equally evasive. He first told the auditor that the workers' compensation lien amounted to approximately two-thirds of the $45,000 settlement, and that the Irving ledger did not reflect respondent's fee of $15,200.

Respondent also disclosed that he owed approximately $150,-000. To the auditor's direct inquiry about whether he had used incoming trust funds for business or personal expenses, respondent admitted, "I'm afraid I might have."

The DEC concluded that respondent had misappropriated both Kaufman's and Irving's account, and recommended public discipline. Likewise, the DRB concluded by clear and convinc-

ing evidence that respondent had knowingly misappropriated the funds of his clients Kaufman and Irving.

## II

This is an unfortunate case of a lawyer in severe financial difficulties using his clients' funds to pay his personal debts. Knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986).

It is undisputed that respondent used the funds of Kaufman and Irving without their authorization or knowledge. Respondent's explanation at the hearing about how he had handled the Kaufman check was not credible. He claimed: (1) Kaufman did not want his ex-wife to receive his check directly because he wanted to conceal his bank-account information, and (2) he wanted to take his fee in the Irving matter without having it pass through his attorney business account, which the Internal Revenue Service had previously levied upon. Kaufman denied that he had asked respondent to conceal his bank-account information. Even if he had made that request, respondent's means of "concealment" was unnecessary, because if he had simply deposited Kaufman's funds in his trust account, Kaufman's account number would have remained unknown to Mrs. Kaufman.

Respondent should have deposited the Kaufman check in his trust account. Instead respondent deposited the check in his *personal* bank account and proceeded to deplete those funds for personal expenses without his client's knowledge. We conclude by clear and convincing evidence that respondent knowingly misappropriated Kaufman's funds.

Likewise, we find that respondent knowingly misappropriated Irving's funds. He used Irving's funds to pay Kaufman without her knowledge or authorization. Moreover, respondent knew that the Reliance lien was to be paid from the settlement

proceeds. He was authorized by his client to pay that lien from the settlement funds and advised his client that he would do so. Instead for sixteen months, respondent failed to pay the lien. Respondent deliberately lied to Reliance about the status of the case. The Irving case was settled on August 24, 1987. Yet, three days after the settlement, respondent advised Reliance that the case was not settled but that only an offer had been made. For the next sixteen months, respondent ignored the numerous telephone and written inquiries Reliance made to him. Only when threatened by a lawsuit did respondent pay the lien.

Most importantly, during this sixteen-month period, respondent did not maintain in his trust fund sufficient funds to pay Reliance's lien. All the parties in the Irving case agreed that respondent would pay Reliance's lien from the settlement proceeds deposited in his trust account. Hence, with respect to that lien respondent acted as the depository of funds. His actions were akin to those of escrow agent. *In re Hollendonner*, 102 *N.J.* 21, 28–29, 504 *A.*2d 1174 (1985), we held that "an attorney found to have knowingly misused escrow funds will confront the disbarment rule of *In re Wilson, supra*, 81 *N.J.* 451 [409 *A.*2d 1153]." Accordingly, we conclude that respondent knowingly invaded the funds that were to be used to pay Reliance's compensation lien. Such action constitutes a knowing misappropriation under *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979).

Respondent's actions are wholly unacceptable. As the DRB in its Decision and Recommendation stated:

This is not simply a trade-off between Kaufman and Irving of fees due. To the contrary, the facts demonstrate clearly and convincingly that respondent, who was in dire need of funds to cover personal expenses, knowingly misappropriated client funds. Respondent intentionally used the Irving funds, intended to cover the Reliance lien, as a float. The Board is convinced that respondent knew that he was misappropriating client funds when he deposited the Kaufman funds in his personal account and drew on those funds, when he drew fees from the Irving trust funds, and at each step thereafter.

The Board notes further that respondent was less than candid and forthright both with the Office of Attorney Ethics auditor and in his testimony before the

District IIIB Ethics Committee. Rather, he was indirect and evasive and, as remarked by the Committee, was 'at best, ambiguous.' Given this fact, the Board attaches no weight to respondent's unsupported and self-serving claims that he believed he had equity in the trust account at the time of the misappropriation of funds.

Respondent's "direct deposit" of Kaufman's funds into his own personal account, his immediate exhaustion of those funds for personal debts, his subsequent disregard of communications from the compensation carrier until threatened by suit, all without any justification, convince us that he knowingly misappropriated the funds of Kaufman and Irving.

Respondent offers no excuses or mitigating factors for his conduct. Indeed, there is none. Respondent used his readily-available clients' funds to help extricate himself from his severe financial difficulties. To protect the public from such knowing misappropriation, we must enforce our strict policy of disbarment.

We therefore conclude that appropriate punishment for respondent is disbarment. Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

CLIFFORD, Justice, concurring.

So persuasively—as always—does our dissenting colleague express his views that I write separately only to set forth the basis of my disagreement with him.

Respondent settled his client Irving's third-party claim against Yellow Freight Lines. The $45,000 settlement was encumbered by a lien of Irving's employer's worker's compensation carrier, which had paid compensation benefits. Respondent had agreed to hold $11,000 in trust to pay the compensation lien. He did not do that. Instead, he diverted $6,400 of that money to his client Kaufman's wife, having previously used Kaufman's funds to pay his own personal obligations.

Moreover, three days after he had settled the Irving claim with Yellow Freight Lines in August 1987, respondent told the

compensation carrier's representative only that Yellow Freight had made a settlement offer. One does not need an elaborate support staff or paralegal assistance or computer printouts to recognize the difference between an offer and a closed deal, or, more to the point here, between the truth and an outright misrepresentation. Not surprisingly, when the compensation carrier inquired periodically during 1988 about the status of the case, its letters went unanswered. Not until the carrier pressed its claim through outside counsel did respondent pay the compromised amount of the lien—sixteen months after Yellow Freight's settlement draft had been deposited in his trust account.

These few remarks are not designed to disparage respondent, who has brought enough grief on himself. Rather their purpose is only to dispel any notion implicit in the dissent that respondent has somehow been victimized by the "demands of a system geared toward big-firm practice," *infra* at 185, 578 *A.*2d at 1225, or that we are dealing here with nothing more serious than a little "bad bookkeeping," *infra* at 185, 578 *A.*2d at 1225. Given respondent's blatant falsehoods concerning the compensation lien and his shell game with other people's money, the fact that he did not surround himself with the lavish trappings of a big-time law firm is of monumental irrelevance. We are talking about simple truth and fair dealing here. One must wonder at our colleague's acceptance of respondent's professional colleague's assurance, *infra* at 185, 578 *A.*2d at 1225 that "when [respondent] says something to be true, it is true."

Sadly, it is not.

O'HERN, Justice, dissenting.

This disciplinary proceeding results from a compliance audit of the trust funds of respondent Donald G. Howard by the Office of Attorney Ethics (OAE) pursuant to *Rule* 1:21–6c. The audit led the OAE to file a complaint against respondent,

which charged him with various ethical violations involving the trust funds. The alleged violations include his failure to maintain required records, failure to safeguard clients' funds, and, most important, misappropriation of clients' funds. This latter allegation is critical to our disposition because of the rule of *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979), that a knowing misappropriation of clients' funds will almost invariably result in disbarment of the attorney.

The District Ethics Committee and the Disciplinary Review Board (DRB) have unanimously agreed that respondent had, indeed, engaged in the unethical misconduct charged and that the knowing misappropriation of clients' funds warrants disbarment. I am unable to agree that the record clearly and convincingly demonstrates a knowing misappropriation. This respected attorney has been practicing law in this State without incident since 1968. Donald Howard was surely a bad bookkeeper, but no one has said here that he was a bad lawyer and no client has lost any money on his account.

The centerpiece of the case against him is a bookkeeping transposition between client and attorney funds in connection with two nearly-simultaneous deposits. He took one client's check for $15,200 (the Kaufman check), intended for Kaufman's wife, and put that in a personal account that was not under an Internal Revenue Service lien. He then took $15,200 of his own funds in the form of a fee from a $45,000 settlement (the Yellow Freight settlement for Robin Henrie Irving) and sent that money on to Mrs. Kaufman. The Yellow Freight deposit had been made on September 2, 1987. The Kaufman deposit was made on September 3, 1987. Mrs. Kaufman received her money on September 17, 1987. Had respondent but put *both* checks *in his trust account* on September 3, 1987, and drawn one check to his personal account and another to Mrs. Kaufman, there would be no issue. In form, what he did was bad. In substance, no harm was intended and no harm was caused.

That leaves us with two issues: the workers' compensation lien (comp lien) on the Yellow Freight settlement, and various personal withdrawals from the trust account.

On the comp lien issue, the comp carrier's representative was candid to admit that such "liens" are always negotiable: "[w]e always compromised them if we were asked to by the attorney." Hence, the paper lien is never, or hardly ever, the actual entitlement of the carrier.

The reason is simple. Every case has weaknesses as did Robin Henrie Irving's. Many times it will not benefit a plaintiff to try a case of marginal liability if the lien is non-negotiable. If the case is not tried to a verdict, the carrier will get nothing. Hence, the quality of the case dictates the treatment of the lien. In his final testimony, the carrier's representative admitted that such a case would be routinely discounted to sixty percent, less an attorney's fee. He claimed that this case had not been "settled that way." The colloquy between respondent's attorney and the carrier's representative follows:

Q. That's what I'm getting at. So that your 11,000 figure you're saying now is probably based on a sixty-percent basis, is that correct?

A. Yeah, but we don't know what the case was settled for.

Q. I understand. But assuming that, you know, assuming that sixty percent was the right figure based upon the liability aspects, correct?

A. Right.

Q. You would have been willing to take 11,000 less $200 plus one-third off?

A. Right, yeah.

Q. And you would have gotten a few bucks on an old dog and you would have looked pretty good, wouldn't you?

A. That's right.

Nonetheless, the DRB was troubled by the question concerning the Yellow Freight settlement; namely, whether respondent had knowingly invaded the carrier's comp lien.

[A BOARD MEMBER]: But, Mr. Schlesinger [respondent's attorney], if you start out with forty-five—

But forget—forget your books are a shambles. I mean, he remembers the 45,000. He didn't have that much activity in his trust account. At least at that size.

MR. SCHLESINGER: Umm.

[THE BOARD MEMBER]: You—

MR. SCHLESINGER: That's—

[THE BOARD MEMBER]: —start with 45,000, he's paid twenty [to Robin Henrie Irving]. He's taken another fifteen-two [for Kaufman]. What does he think remains?

MR. SCHLESINGER: You know, you're only talking about $6,000 [the uncovered amount of the $17,000 comp lien?].

A SPEAKER: That's—

[THE BOARD MEMBER]: I think this Board and the Court have disbarred people for less.

MR. SCHLESINGER: I know.

CHAIRMAN [BOARD]: Where—where does it come from?

The question is, where does it come from?

MR. SCHLESINGER: He's obviously out of trust for $6,000.

CHAIRMAN [BOARD]: No, no.

MR. SCHLESINGER: The—the—

CHAIRMAN [BOARD]: The question is knowledge.

MR. SCHLESINGER: Yes.

CHAIRMAN [BOARD]: Knowing intent.

MR. SCHLESINGER: That's right.

CHAIRMAN [BOARD]: And he has just taken these two figures given by [the Board member], paid out money, taken 15,352. Now, there's $9,800 left, but he knows there's a demand for seventeen.

Where—

[THE BOARD MEMBER]: Well—

CHAIRMAN [BOARD]: —does it come—

MR. SCHLESINGER: —sure.

CHAIRMAN [BOARD]: —from?

MR. SCHLESINGER: First of all, I—

Let me go back on this comp lien for a little, because I think there's a lot of confusion about it.

He never cleared up the confusion, at least not to the DRB's satisfaction. But is there a smoking gun of misappropriation here? Even in a worst case scenario of a 100 cents on the dollar payment on the lien (something that rarely occurs), the carrier's recovery could never have exceeded $11,200 ($17,000 less thirty-three percent less $200 costs). In a best case (for Donald Howard) scenario, the comp carrier would have been claiming $6,600 ($17,000 less forty-percent discount for liability aspect less thirty-three percent less $200 costs). Hence, I am unable to sense the moral quality of disbarment in the handling of that matter. *See In re Kernan,* 118 *N.J.* 361, 367–68, 571

*A.*2d 1282 (1990) (absent definitive instructions about status of third-party's interest in funds, attorney should not be disciplined for taking fee from the deposited funds).

Finally, the personal withdrawals from the account do not in themselves establish a knowing misappropriation. Respondent believed that he had available funds to cover those withdrawals. This is not a case like *In re Fleischer,* 102 *N.J.* 440, 508 *A.*2d 1115 (1986), in which the attorneys deliberately commingled their trust and attorney accounts for the purpose of having client funds available to pay their office expenses. Rather, this case fits more closely into the pattern of recent cases in which we have found that in the absence of clear and convincing proof of a knowing misappropriation, the fact that clients' funds have been invaded does not warrant disbarment. *In re Librizzi,* 117 *N.J.* 481, 569 *A.*2d 257 (1990); *In re Gallo,* 117 *N.J.* 365, 568 *A.*2d 522 (1989); *In re James,* 112 *N.J.* 580, 548 *A.*2d 1125 (1988). In this last case, the attorney had also actually paid various personal obligations out of his trust account. That it should be more excusable because he blamed his secretary is a distinction I find distasteful.

In other cases we have noted the special need for attorneys who represent needy clients. In *In re Johnson,* 105 *N.J.* 249, 520 *A.*2d 3 (1987), we were confronted with much clearer evidence of knowing misappropriation, but we found that Johnson's "delinquencies appear to have resulted from an unwholesome combination of ineptness in respect of office administration and a remarkable absence of equilibrium in balancing his talents and energies with the needs of his clients." *Id.* at 260, 520 *A.*2d at 8–9. Similarly, in a recent case an attorney reimbursed $50,000 to a client to cover estimated misuse of the client's funds. The Court concluded that despite "flagrant record keeping violations," evidence of an unusual business relationship with the client and evidence that the attorney "provided a large volume of pro bono legal services" convinced us that his was not a knowing misappropriation. *In re Chidiac,* 120 *N.J.* 32, 38, 575 *A.*2d 1355 (1990). It is a little hard for

me to see how a $50,000 misuse will not be "knowing," but Donald Howard's must be. Furthermore, we have excused lawyers with more recurrent violations. *See In re Gallo, supra,* 117 *N.J.* 365, 568 *A.*2d 522 (routine commingling of personal and client funds and trust fund invasions excused because of attorney's ignorance of record-keeping procedure).

Single practitioners today face ever-mounting demands of a system geared toward big-firm practice. Such lawyers have no elaborate support staff, paralegal assistance, or computer print-outs of their activities. Of course, you do not need a computer to be an honest lawyer, but we ought to be absolutely certain that we are dealing with more than bad bookkeeping before we disbar an attorney. A long-time friend of respondent at the bar has written to us in his behalf and has offered to assist respondent by providing the support service for bookkeeping and the like needed to improve the business end of respondent's practice. This fellow-attorney is convinced, as am I, that Donald Howard never knowingly misappropriated client funds. He writes:

> Mr. Howard's practice is established in an extremely poor community, Browns Mills, New Jersey, and a good many of his clients are either no-pay or low-pay, yet he gives as much attention to them as he gives to those who can afford a full fee.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> He knows and understands the law in those areas in which he chooses to practice; his homespun way of speech and mannerisms endears him to his clients and enables him to bring down to their level an understanding of what is going on; his abilities have frequently resulted in favorable decisions to his clients; and, from my viewpoint, his respect from both the Bar and the Judiciary in this county is one wherein when Don Howard says something to be true, it is true.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> The loss of his license would deprive the Browns Mills community of someone who is a good lawyer and who has provided a service to many needy people.

We ought not do this.

## ORDER

It is ORDERED that DONALD G. HOWARD of BROWNS MILLS, who was admitted to the bar of this State in 1968, be

disbarred and that his name be stricken from the roll of attorneys of this State, effective September 21, 1990; and it is further

ORDERED that DONALD G. HOWARD be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that DONALD G. HOWARD comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that DONALD G. HOWARD reimburse the Ethics Financial Committee for appropriate administrative costs.

*For disbarment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI, and STEIN—6.

*Opposed*—Justice O'HERN—1.