704 A.2d 1

## IN THE MATTER OF LARRY BLUMENSTYK, AN ATTORNEY AT LAW.

Argued October 6, 1997—Decided December 12, 1997.

*Thomas J. McCormick*, Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Donald R. Belsole* argued the cause for respondent (*Belsole and Kurnos*, attorneys; *Mr. Belsole* and *Janemary S. Belsole*, on the brief).

PER CURIAM.

This attorney-disciplinary case is before the Court based on the decision of the Disciplinary Review Board (DRB or Board) recommending the disbarment of respondent, Larry Blumenstyk. In 1995, the Office of Attorney Ethics (OAE) notified respondent that he would be the subject of a random compliance audit of his attorney books and records. The OAE's preliminary report based on that audit concluded that respondent had knowingly misappropriated trust funds belonging to two clients. The results of a later demand audit confirmed that conclusion. The complaint brought by the OAE and filed with the District X Ethics Committee (DEC) charged respondent with knowing misappropriation of client funds, in violation of *RPC* 1.15 (failure to safeguard client funds) and *RPC* 8.4(c) (conduct involving dishonesty, deceit or misrepresentation). The DRB and the DEC both determined that between December 1994 and June 1995 respondent knowingly misappropriated a total of $85,412.55 [1] of trust funds belonging to two clients. The DRB found that respondent used the misappropriated funds primarily for personal expenses.

---

[1] Respondent disputed the total amount of the misappropriation to the extent that it counts twice the funds taken on January 27, 1995, and February 7, 1995, from the account of one client to reimburse the account of the other client.

## II

Upon a *de novo* review of the record, the Court is satisfied by clear and convincing evidence that respondent was guilty of unethical conduct involving the knowing misappropriation of clients' funds in violation of *RPC* 1.15 and *RPC* 8.4(c).

The facts, as recapitulated by the DRB, disclose that respondent, who was admitted to the New Jersey bar in 1977 and is engaged in the practice of law in Morristown, Morris County, misappropriated from the trust account of a client Donald Cresitello, *viz:*

Respondent represented Donald Cresitello in a real estate matter. On December 2, 1994, respondent deposited into his trust account $65,000 received from Cresitello. The entire $65,000 should have been held intact from the date of deposit until January 27, 1995, when respondent paid the funds over to the proper recipient. However, on December 19, 1994 and January 16, 1995, respondent invaded client trust funds held in behalf of Cresitello, in the amounts of $10,000 and $5,412.55, respectively. Respondent did not have his client's authorization to withdraw the funds.

The facts further reveal knowing misappropriation of trust funds belonging to another client, Edith Messler, *viz:*

Respondent represented Edith Messler in a personal injury matter. The case settled for $115,000. On November 1, 1994, January 17, 1995 and March 3, 1995, deposits totaling that amount were made to respondent's trust account. Messler was entitled to receive $76,237.65 of the total deposited. Accordingly, the $76,237.65 should have remained on deposit in respondent's trust account until respondent released the funds on June 15, 1995. (The delay in disbursing the funds to Messler was not respondent's fault). However, between November 3, 1994 and May 3, 1995, respondent drew ten checks payable to himself, totaling $95,412.55. Respondent was entitled to a legal fee of $25,412.55 for the *Messler* matter. Therefore, he utilized $70,000 ($95,412.55 minus $25,412.55) of the *Messler* funds for his own purposes. Respondent did not have his client's authorization to withdraw the funds. Respondent misappropriated the following amounts from Messler on the following days:

| | |
|---|---|
| January 27,1995 | $ 4,587.45 |
| February 7, 1995 | $ 5,412.55 |
| March 20, 1995 | $ 5,000.00 |
| April 24, 1995 | $30,000.00 |
| April 28, 1995 | $10,000.00 |
| May 3, 1995 | $15,000.00 |

Noting that respondent was well aware of the state of his attorney trust and business accounts during the time period in

question, the DRB found that respondent's misappropriations were knowing. Thus, as respondent stated, "I knew what I was doing when I was taking the Messler money. It is hard to think back on what a bizarre thing I did. But I certainly—I wrote the check with my hand and I knew. I hated it and I did it all the same time." The DRB further concluded that on several occasions respondent transferred misappropriated funds from his trust account to his business account to avoid overdrafts in the business account and that respondent's records revealed that he had taken loans from family members.

Respondent cites the fact that he borrowed the funds only temporarily and his restitution of the funds as mitigating factors.

We are fully cognizant, as was the DRB, of respondent's explanation for his misconduct. He stated that he had made financial commitments with the expectation that he would receive, in March 1994, a distribution from personal trust funds established by his parents in the amount of approximately $100,000. He used the funds to defray personal expenses solely for his own convenience, including a family vacation to Israel in December 1994 (approximately $15,000), his son's Bar Mitzvah in April 1995 (approximately $30,000), and tax payments to the Internal Revenue Service in April 1995 ($21,199). Because of his parents' physical and marital difficulties, the anticipated distribution was not made until June 1995. On June 9, 1995, almost three months before he was notified that he would be the subject of a random audit, respondent deposited $100,046.99 of his personal funds into the trust account, and thereby fully restored the amounts that had been improperly withdrawn from the respective accounts. Respondent stated that although he could have borrowed the money he needed from other sources, he chose not to do so because he could not bring himself to discuss his finances with his wife or parents. Respondent acknowledges that he now realizes that not telling his wife about his finances was "absolutely stupid."

Respondent relies on *In re Noonan,* 102 *N.J.* 157, 506 *A.*2d 722 (1986), and *In re Gallo,* 117 *N.J.* 365, 568 *A.*2d 522 (1989), as a

basis for more lenient discipline. In both *Noonan* and *Gallo*, however, the Court determined that the misappropriations were negligent, rather than knowing. Clearly, that is not the case here, where respondent admitted that he knowingly misappropriated his clients' funds.

■ Respondent's restitution of the funds prior to notification of the random audit of his records indicates that he did intend only to "borrow" funds in the sense that he planned to use the funds for his own purposes only temporarily before restoring them. Nevertheless, restitution does not alter the character of knowing misappropriation and misuse of clients' funds.

> Intent to deprive permanently a client of [his or her] funds ... is not an element of knowing misappropriation. Nor is the intent to repay funds or otherwise make restitution a defense to the charge of knowing misappropriation. A lawyer who uses funds, knowing that the funds belong to a client and that the client has not given permission to invade them, is guilty of knowing misappropriation. The sanction is disbarment.
>
> [*In re Barlow*, 140 *N.J.* 191, 198–99, 657 *A*.2d 1197 (1995).]

*See also In re Freimark*, 152 *N.J.* 45, 57–58, 702 *A*.2d 1286 (1997) (disbarring attorney for knowingly "borrowing" client funds).

The restitution of misappropriated funds does not alter or obscure the fact that

> [w]hen restitution is used to support the contention that the lawyer intended to "borrow" rather than steal, it simply cloaks the mistaken premise that the unauthorized use of clients' funds is excusable when accompanied by an intent to return them. The act is no less a crime. Lawyers who "borrow" may, it is true, be less culpable than those who had no intent to repay, but the difference is negligible in this connection.
>
> [*In re Wilson*, 81 *N.J.* 451, 458, 409 *A*.2d 1153 (1979) (citation omitted).]

Respondent apparently contends that his motives in using the funds were not nefarious because he sought merely to use these funds only temporarily for his own convenience. He maintains that his motives should militate against the gravity of the misappropriation. But in *Noonan, supra,* the Court underscored the irrelevance of an attorney's intent and motives:

> It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he

ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant: it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment.

[102 *N.J.* at 160, 506 *A.*2d 722.]

The misuse of clients' money as a matter of convenience to defray personal expenses, such as for a vacation and a party, does not ameliorate the ethical misconduct. Family financial pressures cannot excuse an attorney's ethical dereliction. *See In re Warhaftig*, 106 *N.J.* 529, 534–36, 524 *A.*2d 398 (1987); *In re Lennan*, 102 *N.J.* 518, 524–25, 509 *A.*2d 179 (1986).

Respondent also cites his unblemished record as a mitigating factor. The Court has made it clear that a satisfactory or distinguished career does not lessen the enormity of the knowing misappropriation of a client's funds:

The inexperience or, conversely, the prior outstanding career, of the lawyer, often considered a mitigating factor in disciplinary matters, seems less important to us where misappropriation is involved. This offense against common honesty should be clear even to the youngest; and to distinguished practitioners, its grievousness should be even clearer.

[*Wilson, supra*, 81 *N.J.* at 459–60, 409 *A.*2d 1153.]

Respondent also asserts generally that he was psychologically disabled. We note, however, he offered neither expert testimony nor documentary evidence indicating or supporting a psychological or mental disability sufficient to overcome the knowing and voluntary nature of the misappropriation. *See In re Jacob*, 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984).

We determine that respondent's knowing misappropriation violated *RPC* 1.15 and *RPC* 8.4(c). We conclude, as we stated in *Wilson, supra*, 81 *N.J.* at 453, 409 *A.*2d 1153, that "disbarment is the only appropriate discipline" for knowing misappropriation of client funds. We, therefore, disbar respondent. Respondent shall reimburse the Disciplinary Oversight Committee for the appropriate administrative costs.

So ordered.

*For disbarment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that **LARRY BLUMENSTYK** of **MORRIS-TOWN**, who was admitted to the bar of this State in 1977, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **LARRY BLUMENSTYK** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **LARRY BLUMEN-STYK**, pursuant to *Rule* 1:21–6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that **LARRY BLUMENSTYK** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that **LARRY BLUMENSTYK** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.