IN THE MATTER OF ARNOLD M. WARHAFTIG, AN
ATTORNEY AT LAW.

Argued January 20, 1987—Decided April 21, 1987.

*Robyn M. Hill,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Joseph A. Hayden, Jr.,* argued the cause for respondent (*Hayden and Perle,* attorneys; *Richard F.X. Regan,* on the brief).

PER CURIAM.

In this disciplinary proceeding, arising out of a presentment filed by the District XII Ethics Committee, respondent is charged with invading trust account funds by withdrawing anticipated legal fees in advance of real-estate closings. The Disciplinary Review Board (DRB or Board) concluded that respondent had engaged in unethical conduct, but that knowing misappropriation had not been established by clear and convincing evidence. The Board therefore recommended that respon-

dent be publicly reprimanded. Because we conclude that re-
spondent's conduct clearly constituted knowing misappropria-
tion under *In re Wilson*, 81 *N.J.* 451 (1979), we decline to adopt
the DRB's recommendation, and instead order that respondent
be disbarred.

I

The charges filed against respondent were the result of a
random compliance audit conducted by the Office of Attorney
Ethics pursuant to *Rule* 1:21–6(c). The audit took place in
November and December, 1983, and covered the two-year peri-
od ending on October 31st of the same year. The audit findings
were summarized in the Board's Decision and Recommendation:

> The audit disclosed that respondent
>
> continually issued checks to his own order for fees in pending real estate
> matters. He would replace the "advance" when the funds were received for
> the real estate closing [audit report at 3].
>
> In one case, a real estate closing occurred on September 19, 1983. Funds
> totalling $70,722.33 were deposited into respondent's trust account on Septem-
> ber 20, 1983. In another case, a real estate closing took place on October 28,
> 1983. The funds totalling $150,686.27 were deposited into his trust account on
> October 31, 1983. However, respondent had issued a check to his order for
> $910 on June 16, 1983 which represented his fee of $455 for each of these two
> closings. The audit report revealed other instances where respondent similarly
> took advance fees. A summary of these instances follows:

### Fees Taken In Advance of Closings

| Days in Advance | 1–30 | 30–60 | 60–90 | 90–120 | 120 |
|---|---|---|---|---|---|
| Number of Instances | 6 | 9 | 3 | 2 | 2 |
| Total Withdrawn | $2,600 | 3,935 | 1,110 | 910 | 910 |

\*    \*    \*    \*    \*    \*    \*    \*

> Respondent maintained his own lists of fees taken in advance. This list
> contained the names of clients and the amounts he anticipated earning from

these clients in pending real estate closings. As a closing occurred and the fee was earned, respondent would delete the client's name and fee. When an anticipated closing fell through, respondent would replace the fee he had earlier advanced to himself.

> \*    \*    \*    \*    \*    \*    \*    \*

When respondent received notice of the audit, he contacted his accountant who advised him that if his trust account was short he should immediately replace the funds. Respondent borrowed $11,125 from accounts in the names of his two teenage sons and deposited the money into his trust account to cover the withdrawn fees. Respondent made this deposit about five days before the originally scheduled audit date of October 4, 1983.

The auditor was not able to determine which clients' monies respondent had taken because of the size of respondent's real estate practice. Money continually flowed in and out of the trust account. Respondent, at the ethics hearing, maintained that he never failed to make the proper disbursements at the closings and that no one ever lost money as a result of his practice. He discontinued this practice in September 1983 when he received notice of the audit.

At the Ethics Committee hearing, respondent explained that his withdrawal of advance fees from the trust account was necessitated by the "gigantic cash flow burden" he experienced beginning in the early 1980's. Such pressures were the result of a precipitous decline in his real-estate practice. At the same time, an additional strain on respondent's finances was created by his wife's having to undergo treatment for cancer, and by his son's need for extensive psychiatric counseling. According to respondent, only a small portion of these expenses was covered by insurance.

Respondent was also questioned at the hearing as to whether he knew, at the time the advance-fee scheme was implemented, that his conduct constituted an ethical violation. Respondent stated:

> I was aware that what I was doing was wrong, and I was also aware that no one was being hurt by what I was doing. And what I was doing, especially by keeping lists like this, was making sure that nobody would get hurt by what I was doing.

> \*    \*    \*    \*    \*    \*    \*    \*

> My perspective on the taking of the money was it was wrong, it was a violation of the rules. But I was so certain that no one could possibly be hurt by it that I didn't feel that I was stealing, certainly not stealing.

In a presentment filed on June 28, 1985, the Ethics Committee concluded that respondent had failed to comply with the record-keeping provisions of *Rule* 1:21–6; that several checks he had drawn on business accounts were dishonored for insufficient funds; that he had made false entries in his trust account records, contrary to *DR* 9–102; and that he had misappropriated clients' funds, also a violation of *DR* 9–102. Specifically, the presentment stated that "[r]espondent's conduct was clearly unethical in that he did deliberately and repeatedly take funds from his trust account equal to anticipated fees." The panel therefore recommended that respondent be publicly disciplined, but directed the attention of the DRB to several mitigating factors it found to be present in the case.

The DRB adopted these conclusions in its decision. Acknowledging that "[a] knowing act is required before any taking of funds warrants * * * disbarment[,]" the Board observed:

> Respondent believed that the funds taken by him were fees that he would invariably receive from real estate transactions. The modest amounts taken were exactly those that he anticipated. Although his business account had frequent overdrafts, there is absolutely no indication in this record that respondent ever used trust funds to cover them.

> \* \* \* \* \* \* \* \*

> Respondent while acknowledging that his premature withdrawal of fees was improper, did not perceive it as misappropriation of clients' funds. He advanced to himself only such monies to which he had a colorable interest.

The Board concluded that the record did not support a finding that knowing misappropriation had occurred in this case. The Board, in recommending a public reprimand, also noted the existence of several mitigating factors: respondent's discontinuance of the practice at issue; his cooperation with the Office of Attorney Ethics; the acknowledgment of his wrongdoing; and the fact that no clients were actually injured by respondent's conduct.

A single member of the Board dissented from its recommendation, noting that

> [r]espondent withdrew funds from his trust account to pay himself for services rendered and to be rendered to a particular client without necessarily having

funds belonging to that particular client in his trust account. In short, he was using funds belonging to client A to pay fees owed and to be owing by client B. Under *In re Wilson*, 81 *N.J.* 451 (1979), this "borrowing" of client funds constitutes a misappropriation and warrants disbarment.

## II

In recommending public discipline, the DRB recognized that *In re Wilson, supra,* which requires the disbarment of an attorney who knowingly misappropriates his clients' funds, controls the outcome of this case. However, the Board emphasized a perceived distinction between respondent's conduct, which it characterized as the "premature withdrawal of * * * monies to which he had a colorable interest[,]" and the knowing misappropriation described in *Wilson, supra.* Apparently, the Board was persuaded by respondent's contention that while he was aware that he was violating a Disciplinary Rule, he "didn't feel that [he] was stealing * * *."

The distinction drawn by the DRB cannot be sustained under the *Wilson* rule. As we stated in *In re Noonan*, 102 *N.J.* 157, 160 (1986), knowing misappropriation under *Wilson* "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." We have consistently maintained that a lawyer's subjective intent, whether it be to "borrow" or to steal, is irrelevant to the determination of the appropriate discipline in a misappropriation case. *Ibid.; In re Lennan*, 102 *N.J.* 518, 523 (1986); *In re Wilson, supra,* 81 *N.J.* at 455 n. 1. In *Wilson, supra,* we articulated the reason for this strict approach:

Lawyers who "borrow" may, it is true, be less culpable than those who had no intent to repay, but the difference is negligible in this connection. Banks do not rehire tellers who "borrow" depositors' funds. Our professional standards, if anything, should be higher. Lawyers are more than fiduciaries: they are representatives of a profession and officers of this Court. [81 *N.J.* at 458.]

It is clear that respondent's conduct constituted knowing misappropriation as contemplated by *Wilson.* Through the use of the advance-fee mechanism, he took funds from his trust account before he had any legal right to those monies. These

"fees" were taken by respondent before he received any deposits in connection with the relevant real-estate closings. Thus, he was effectively borrowing monies from one group of clients in order to compensate himself, in advance, for matters being handled for other clients. Respondent made these withdrawals with full recognition that his actions had not been authorized by his clients, and that he was therefore violating the rules governing attorney conduct. Respondent's unauthorized misappropriation of clients' trust funds for his personal needs cannot be distinguished from the conduct condemned in *Wilson, supra. See also In re Lennan, supra,* 102 *N.J.* at 521 (respondent disbarred where audit disclosed "a pattern of taking trust funds held as deposits on real estate closings and replacing them before the closing occurred").

The DRB also based its decision on the existence of several mitigating factors. Our review of the record, in light of the plain language of *Wilson* and our subsequent decisions, compels the conclusion that these factors should be given little weight. The Board noted the fact that no client was injured by respondent's conduct, and that he replaced the funds he had misappropriated. However, we have emphasized in the past that the absence of client losses is irrelevant in a misappropriation case. *See, e.g., In re Lennan, supra,* 102 *N.J.* at 524 ("the fact that no client suffered a loss was fortuitous and therefore irrelevant"); *In re Gavel,* 22 *N.J.* 248, 265 (1965) (finding "little merit in the plea by respondent that no one suffered as a result of his wrongful acts"). The Board also pointed to respondent's having been a member of the Bar since 1968, and the evidence of his good character adduced at the ethics hearing. However, as we made clear in *Wilson, supra,* the prior outstanding record of an attorney cannot diminish the seriousness of misappropriation of client funds:

This offense against common honesty should be clear even to the youngest; and to distinguished practitioners, its grievousness should be even clearer. [81 *N.J.* at 460.]

The DRB also observed that respondent, in the three years since the audit occurred, had discontinued the practice of taking

advance fees, and that recurrence of this practice would be extremely unlikely. Here again, our holding in *Wilson, supra,* makes consideration of this factor improper. *Id.* at 460 n. 4; *see In re Hein,* 104 *N.J.* 297, 304 (1986). Finally, the Board took note of respondent's cooperation with the investigation, and his acknowledgment of his guilt. While we acknowledge respondent's candor in admitting his wrongful conduct, we cannot accord it any significance as a mitigating factor. *See In re Fleischer,* 102 *N.J.* 440, 448 (1986); *In re Wilson, supra,* 81 *N.J.* at 459.

In concluding that respondent's mishandling of his clients' trust funds requires that he be disbarred, we again confront the harsh results of the *Wilson* rule. We note the very real hardship that beset respondent's family and apparently led to his wrongful conduct. It is especially tragic that these unfortunate circumstances contributed to conduct requiring the disbarment of an attorney who, for the better part of his career, has conducted himself in an exemplary fashion.

Yet, we are also mindful that our primary purpose here is not to punish attorneys, but to protect the public. *See In re Hein, supra,* 104 *N.J.* at 302. This purpose is so vital to the proper functioning of our profession that we have consistently declined to create exceptions to the *Wilson* rule, even where the misappropriation was the product of severe personal and financial hardship. *See In re Lennan, supra,* 102 *N.J.* at 524. In our view, the overriding need "to preserve the confidence of the public in the integrity and trustworthiness of lawyers[,]" *In re Wilson, supra,* 81 *N.J.* at 456, requires that we continue to apply the strictest discipline in misappropriation cases. Anything less would undermine the effectiveness of the *Wilson* rule and erode public confidence in the integrity of the legal profession.

Finally, while we understand that respondent's conduct was in large part the result of financial pressures caused by serious illness within his family, it appears that respondent had other

sources of funds available to him. By his own admission, as soon as he was informed of the audit, respondent restored the deficit in his trust account with $11,125 borrowed from bank accounts in his sons' names. Respondent should have considered the availability of other sources of funds when his financial difficulty first arose. Instead, he misappropriated monies belonging to his clients, despite his knowledge that this practice constituted a violation of the rules governing attorney conduct.

In view of our conclusion that respondent knowingly misappropriated client funds, we order that he be disbarred. Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

*For disbarment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

### ORDER

It is ORDERED that ARNOLD M. WARHAFTIG of UNION, who was admitted to the bar of this State in 1968, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that ARNOLD M. WARHAFTIG be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.