596 A.2d 752
IN THE MATTER OF MICHAEL J. BELL,
AN ATTORNEY-AT-LAW.

Argued September 26, 1989—Decided October 4, 1991.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Matthew Boylan* argued the cause for respondent (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys).

PER CURIAM.

This matter stems from three complaints filed against respondent following an audit of his books and records. The District VI Ethics Committee (Ethics Committee) found that respondent had engaged in conduct involving dishonesty and misrepresentation, in violation of *DR* 1–102(A)(4); had overreached clients in charging excessive fees, in violation of *DR* 2–106(D); had violated record keeping regulations, *R.* 1:21–6 and *DR* 9–102(B)(3) and (C); had failed to preserve the identity of client funds, in violation of *DR* 1–102(A); and had engaged in other

activities adversely reflecting on his fitness to practice law, in violation of *DR* 1–102(A)(6). Although it found that respondent had misused trust funds, the Ethics Committee did not determine whether the misuse was knowing.

The Disciplinary Review Board (DRB) agreed substantially with the Ethics Committee's findings. In addition, the DRB found that respondent knowingly misappropriated client funds in three separate matters. Accordingly, the DRB recommended that respondent be disbarred. Three dissenting members of the DRB found respondent's misuse of client funds to be negligent and recommended a three-year suspension.

Our independent review of the record leads us to conclude that respondent knowingly misappropriated client funds and that he must be disbarred. Because of that conclusion, this opinion is concerned, to the exclusion of other allegations of attorney misconduct, solely with the issue of knowing misappropriation. Within that context, we further limit the opinion to the acts of misappropriation that occurred after the publication of *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979).

I

The record clearly and convincingly establishes that respondent knowingly misappropriated trust funds in two post-*Wilson* matters. In the first, his clients were James and Maryann Maguire, and in the second, his client was his cousin, Maurice Spagnoletti.

The DRB summarized the facts in these two matters:

> In the *Maguire* matter, for instance, respondent deposited two checks in his trust account, one for $9,300 and the other for $1,000, representing the deposit tendered by the purchasers of the Maguires' property. Those deposits were made on December 1, 1979, and January 9, 1980, respectively. Notwithstanding the fact that no disbursements were made on the Maguires' behalf until March 31, 1980, the trust account balance was only $1,697.12 on December 31, 1979, $968.98 on January 7, 1980, $1,053.07 on January 31, 1980, and $12.98 on February 29, 1980. However, respondent should have held $10,300 in trust for the Maguires until March 31, 1980. Thus, the trust account shortage in *Maguire* ranged from more than $8,000 to more than $10,000. $8,000 of that

shortage resulted from two payments to respondent in December: one check for $3,000 which cleared on December 12, 1979, and a second check for $5,000 payable to respondent, which cleared on December 17, 1979.

At the ethics hearing of January 14, 1987, respondent conceded that there was a trust account shortage in connection with the Maguire transaction. He testified that he was unable to explain the reason for the shortage as a result of the destruction of all his records by a fire in his office in late 1979. He recalled, however, that "there were monies that were supposed to come from (client) Malfettone which did not come which caused a shortage. And I believe the same day, I made a loan ... which satisfied the overdraft." Indeed, the record shows—and respondent so admitted—that in April 1980 he obtained a $35,000 loan which he deposited in his trust account to cover a shortage in connection with "one of the two real estate transactions." [1]

Similarly, in the *Spagnoletti* matter, on June 18, 1980, respondent's trust liability to his client consisted of $20,074.64. On that date, however, the trust account balance was only $18,137.68. From June 23 through July 7, 1980, respondent's trust liability to Spagnoletti amounted to $15,051.44. On June 23, however, the trust account balance was only $12,022.04 and, by July 7, 1980, it had declined to $1,903.60. The three largest decreases in the trust account balance were the result of three checks of $3,000 each made payable to respondent. Those checks were dated July 1, July 2, and July 5, 1980. (Exhibit P–9 attached to the complaint). The July 1 and July 2 checks were cashed on those same days; the July 5 check was cashed on July 7, 1980 (Exhibit P–8 attached to the complaint).

[Footnote and transcript references omitted.]

### From these facts, the DRB concluded:

It matters not that respondent might not have utilized those funds for his own gain, as he contends. *In re Wilson, supra*, 81 *N.J.* at 455 n. 1 [409 *A.*2d 1153]; *In re Noonan*, [102 *N.J.* 157, 160, 506 *A.*2d 722 (1986).]

The record is replete with clear instances of knowing misappropriation of trust funds. In the absence of an outright admission, circumstantial evidence can lead to the conclusion that a lawyer knew or had to know clients' funds were being invaded. *Matter of Johnson*, 105 *N.J.* 249, 258 [520 *A.*2d 3] (1987).

By respondent's own admission, beginning in December, when he had a coronary bypass operation, and during the relevant times mentioned in the complaint, 1978 through 1980, "I really didn't feel I was practicing law." I had no "outside office. I was using my home. I wasn't listed. I (did not) believe I had an office phone. I didn't have a secretary.... I had no sign; and I didn't

---

[1]Respondent admitted to allegations of the Ethics Committee complaint that on April 19, 1980, he was out-of-trust to the Maguires by over $21,000. The Ethics Committee established the deficit by deducting from the proceeds of the sale of the Maguire's existing home the costs of that sale and of the purchase of their new home. On April 14, respondent brought the account into balance by depositing the above-described $35,000 loan.

solict any business. The only work I was doing was for people I had a personal relationship with." Accordingly, respondent cannot argue that the volume of his practice, combined with the fact that he was a sole practitioner, precluded him from closely examining his trust account records and that, consequently, any misuse of client funds was negligent, not intentional. As the Court stated in *Matter of Johnson, supra,* 105 *N.J.* at 260 [520 *A.*2d 3] (1987):

> [W]e do not intend to suggest that henceforth a respondent who just walks away from his fiduciary obligation as safekeeper of client funds can expect this Court to take an indulgent view of any misappropriation. We will view "defensive ignorance" with a jaundiced eye. The intentional and purposeful avoidance of knowing what is going on in one's trust account will not be deemed a shield against proof of what would otherwise be a "knowing misappropriation." There may be semantical inconsistencies, but we are confident that within our ethics system, there is sufficient difference between intentional ignorance and legitimate lack of knowledge.

> [Transcript references omitted.]

In *Wilson,* we declared, in now familiar language, that a misappropriation is "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." 81 *N.J.* at 455 n. 1, 409 *A.*2d 1153. Knowing misappropriation "consists simply of a lawyer's taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986). In both the Maguire and Spagnoletti matters, as the DRB concluded, "the record is replete with clear instances of knowing misappropriation of trust funds."

Our examination of the record reveals that during the period he handled the Maguire and Spagnoletti matters, respondent used his trust account both as a business account and as a personal account to accommodate some of his friends, generally elderly acquaintances whose bills respondent paid. Respondent regularly paid these bills regardless of whether sufficient funds were in his trust account to cover the expenditures. The practice began before the publication of *Wilson* and continued thereafter. Respondent described his use of trust funds for his friends in the late 1970s:

A. Well, at the time, I know I had a lot of personal problems; and, quite honestly, I don't think I was putting in the attention to the accounts that probably normally I would have had before 1976.

But I had records. I knew who had money in the account, and who had to give me money, you know, at all times.

Q. Well, would it ever come an occasion where you made an advance for [your friend], and he owed the money, and you paid out money on his behalf despite the fact that you didn't have it?

A. (No response.)

Q. You didn't have it from him to make the disbursement?

A. Oh, yeah. That happened a number of times.

Q. And would that be the reason that your trust account might have been deficient in those areas by virtue of doing the work you were doing for these particular [friends]?

A. Well, at certain times, yeah, I would assume it would.

Respondent justifies his misuse of clients' funds because of his personal problems. In 1975, respondent's father died, and in the following year, respondent underwent double bypass heart surgery. After this operation, respondent essentially ceased accepting clients. He completed pending matters and accepted new matters from friends only. In 1977, respondent's brother committed suicide. The following year respondent developed a nervous condition and impotency due to a diabetic condition. In 1979, because of an automobile accident, he was hospitalized for one month with two herniated discs and related back ailments. In December of that year, his residence, in which his office was located, burned down. Finally, in May 1980, his mother suffered a stroke.

The thrust of respondent's argument is that his personal problems so distracted him that he could not diligently manage his trust account. He admitted, however, that he knew that it was unethical to use client funds without authorization. Furthermore, contrary to his asserted inability to manage his trust account from 1978 to 1980, respondent perceived himself during this period as possessing sufficient financial expertise to manage the affairs of others. In this regard, he testified:

Q. Now, going back to the Maguire real estate transactions with Burch [the pre-*Wilson* matter], could you, as an attorney since 1960—did you understand

that when you received the funds of $9300 and $1000, that these funds were to be held by you and not to be disbursed until the closing?

A. As a lawyer, as a matter of general knowledge, of course, I know that I have to say, though, my state of mind was such that whatever you want to call it, neglect, lack of concern, whatever * * *.

\* \* \* \* \* \* \* \*

I was not conducting a law practice, although I may have filed a tax return listing myself as a lawyer; but I certainly was not the same lawyer I was * * *.

Q. I won't argue with you; but despite the fact that you might not have been the same lawyer that you were, you did know even at that time that this is what was supposed to be done with the money?

A. I admit that, yes.

Q. Mr. Bell, other than your practice as an attorney at law, would you consider yourself to have any expertise in any other area.

A. Yes.

Q. What area would that be?

A. Financial.

Q. During the years 1978, 1979, and 1980, would you still have considered yourself to be an expert in the area of finances?

A. Yes.

Respondent does not deny that using his business account as a trust account was improper or that his record keeping was shoddy and haphazard. Lawyers, as we have said, "have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds." *In re Fleischer*, 102 *N.J.* 440, 447, 508 *A.*2d 1115 (1986). As fiduciaries, lawyers are obliged to know whether their trust accounts are in balance. Here, the conclusion is inescapable that respondent knew he was using client funds without authorization. It makes no difference that respondent did not use any of the funds for his own purposes or that no client suffered from his misappropriation. *In re Noonan, supra,* 102 *N.J.* at 160, 506 *A.*2d 722.

Respondent's claim that his physical and mental problems excuse or mitigate his misappropriations are likewise unavailing. Nothing in the record establishes that his problems caused his misappropriations. *In re Jacob*, 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984). Absent a "demonstration by competent medical proofs that respondent suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious

misconduct," his physical or mental condition will not excuse the knowing misuse of client funds.  *Ibid.*

## II

Although respondent may have endured more grief within several years than many endure in a lifetime, his suffering did not prevent him from knowing what he was doing when he misused client funds.  Accordingly, we find that respondent knowingly misappropriated funds in violation of *DR* 9–102 and must be disbarred.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

STEIN, J., concurring in part and dissenting in part.

I expressed the view in *In re Konopka,* 126 *N.J.* 225, 596 *A.*2d 733 (1991), that

although the *Wilson* rule is the right rule for the vast majority of misappropriation cases, the inflexibility with which it can be applied runs the risk of creating within our attorney-discipline system an almost reflexive approach to such cases, obscuring and ignoring the individual circumstances to an intolerable degree. [*Id.* at 241, 596 *A.*2d 733.]

I observed that the Court's dispositions in misappropriation cases "would in my view better reflect the collective wisdom of the Court and better serve the interests of the bar and the public if they were tempered by a recognition that under special circumstances discipline short of disbarment may occasionally be appropriate in knowing misappropriation cases."  *Id.* at 259, 596 *A.*2d 733.

The Court's opinion cites two instances of respondent's knowing misappropriation, both of which allegedly occurred after respondent had undergone double by-pass heart surgery and had ceased accepting new matters other than for friends.  At the District Ethics Committee hearing in 1987, respondent was unable to justify the trust-account shortage in one client's funds that concededly had existed in 1980, explaining that a fire

had destroyed his office records in 1979. The evidence of knowing misappropriation was sufficiently ambiguous that three members of the Disciplinary Review Board concluded that respondent's conduct was negligent, not knowing. The record also reflects that any funds withdrawn improperly were replaced, no client having sustained any financial loss. I also note that respondent voluntarily placed his name on the inactive list in 1980, and has not practiced law since then.

The most distinctive aspect of this record is that respondent attributes his inattention to his practice and the resultant misuse of clients' funds to a devastating sequence of events affecting respondent and his family. Acknowledging that "respondent may have endured more grief within several years than many endure in a lifetime," *ante* at 267, 596 *A.*2d 75, the Court's opinion enumerates the personal tragedies that respondent sustained during the period preceding his alleged misappropriation:

> In 1975, respondent's father died, and in the following year, respondent underwent double by-pass heart surgery. After this operation, respondent essentially ceased accepting clients. He completed pending matters and accepted new matters for friends only. In 1977, respondent's brother committed suicide. The following year respondent developed a nervous condition and impotency due to a diabetic condition. In 1979, because of an automobile accident, he was hospitalized for one month with two herniated discs and related back ailments. In December of that year, his residence, in which his office was located, burned down. Finally, in May 1980, his mother suffered a stroke. [*Ante* at 265, 596 *A.*2d 752.

In its application of the *Wilson* rule the Court has ignored instances of personal tragedy in determining discipline for knowing misappropriation, see *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986), in the absence of proof that the lawyer's problems actually *caused* the misappropriation of clients' funds. *See In re Jacob,* 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984). That standard of proof heretofore has been unattainable by lawyers whose misappropriation of funds has occurred during periods of alcohol or drug impairment or in the course of personal or family tragedy.

In my view, insistence on proof that this respondent's personal suffering *caused* him to misappropriate funds is both unrealistic and pointless. Our human experience is sufficient to infer a relationship between severe personal stress and acts of imprudence or even desperation. The question should not be one of causation, but rather whether our disciplinary system is sufficiently flexible in unique circumstances to temper the imposition of discipline by taking into account the influence of extraordinary events. It should be in this case.

Accordingly, I would not vote to disbar. In my view, respondent should be suspended indefinitely from the practice of law, with leave to apply for reinstatement at such time as respondent is able to demonstrate his fitness to resume practice.

*For disbarment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER and POLLOCK—4.

*Concurring in part, dissenting in part*—Justices O'HERN, GARIBALDI and STEIN—3.

### ORDER

It is ORDERED that MICHAEL J. BELL of JERSEY CITY, who was admitted to the bar of this State in 1960, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that MICHAEL J. BELL be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by MICHAEL J. BELL, pursuant to *Rule* 1:21-6, shall be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that MICHAEL J. BELL comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that MICHAEL J. BELL reimburse the Ethics Financial Committee for appropriate administrative costs.