658 A.2d 1264

IN THE MATTER OF WALTER L. ROTH, JR., AN ATTORNEY AT LAW.

Argued February 28, 1995—Decided June 16, 1995.

*Walton W. Kingsbery, III,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Charles J. Sprigman, Jr.,* argued the cause for respondent.

PER CURIAM.

Following an investigative audit conducted in May 1991, the Office of Attorney Ethics (OAE) filed a seven-count complaint with the District XIV Ethics Committee against respondent, Walter L. Roth, Jr. Respondent was charged with four counts of knowing misappropriation of client trust-account funds involving four separate transactions: the *McCracken* matter, the *Four Seasons* matter, the *Hillcrest* matter, and the *$10,000 Loan* matter. Respondent was additionally charged with one count of commingling of funds, one count of gross neglect of a client

matter, and one count of misrepresentation to the OAE. Respondent admitted that he had commingled personal and client funds in his trust account, and that he had failed to pursue a client matter with diligence, but disputed that he had knowingly misappropriated client funds, or that he had misrepresented facts to the OAE.

The report of the Special Ethics Master characterized the essential issue as whether "the misappropriations[ ] were done *knowingly,* as OAE contends, or *negligently,* as Respondent contends," and concluded that the OAE had failed to demonstrate by clear-and-convincing evidence that respondent had knowingly misappropriated client funds, or that the conduct of respondent had amounted to dishonesty or fraud. The Special Master recommended that respondent be suspended for six months and be subject to monitoring to ensure proper trust accounting in the future. The Disciplinary Review Board (DRB) divided five-to-three on the issue of knowing misappropriation and partly rejected the finding of the Special Master. The majority of the DRB found that "the record clearly and convincingly establishes that respondent's misappropriation of client funds in [the *McCracken* matter, the *Four Seasons* matter, and the *Hillcrest* matter] was knowing," and concluded that disbarment was the only appropriate sanction. Three members of the DRB found that the proofs did not support the determination that respondent knowingly misappropriated client funds and would have imposed a six-month suspension.

I

Respondent is charged with four counts of knowing misappropriation arising from four transactions. In its Decision and Recommendation, the DRB summarized the relevant evidence from each of the four matters.

A

The DRB first detailed the factual background of the *McCracken* matter:

Respondent represented Horace and Carol McCracken in negotiating a settlement of their outstanding debts owed to Debt Consultants, Inc. On or about July 27, 1990, respondent and Daniel C. Hoffman (the grievant in the *McCracken* matter), counsel for Debt Consultants, settled the matter for $1,300. By letter to respondent dated July 27, 1990, Hoffman confirmed the terms of the settlement and enclosed a stipulation of settlement to be executed by respondent's clients. Respondent received this letter a day or two later.

On July 30, 1990, the McCrackens gave respondent a check in the amount of $1,300, payable to "Walter L. Roth, Jr." Respondent deposited that check in his trust account on that same day.

On August 27, 1990, respondent wrote to Hoffman, enclosing an executed consent order and assuring him that the McCrackens' check would follow within seven days. On October 2, 1990, the court signed the stipulation of settlement. Although respondent acknowledged having received the signed stipulation in October or November 1990, he did not send Hoffman the $1,300 payment. Respondent had no explanation for his failure to send the payment after the receipt of the signed stipulation. His testimony was that "I just didn't do it * * *. I felt that basically everything was coming down around me." Respondent was alluding to several personal problems that beset him at the time, detailed below.

By letter dated October 9, 1990, Hoffman complained to respondent that payment had not been made. Hoffman also informed respondent that he would be seeking the entry of a judgment in the amount of $2,771.30. Indeed, on January 28, 1991, the court entered a judgment against the McCrackens in the amount of $2,331.16, together with pre-judgment interest in the amount of $349.67, for a total of $2,680.83 plus costs and counsel fees.

During a telephone conversation with Hoffman, in March 1991, respondent claimed that his secretary had mistakenly deposited the $1,300 check in the wrong account, a fact of which he had become aware only after the receipt of Hoffman's letters complaining about the non-payment. Hoffman then agreed to accept the $1,300, if paid immediately. Once again, respondent did not send the payment to Hoffman. That fact caused Hoffman to write respondent a letter, on April 1, 1991, questioning respondent's earlier explanation of the misdeposit and also informing respondent that he would be notifying the disciplinary authorities of respondent's conduct, within seven days from the date of the letter.

On May 6, 1991, upon receipt of the *Hoffman* grievance, the OAE conducted a second audit of respondent's books and records. When respondent failed to produce all the requested records, the audit was continued until May 20, 1991, at respondent's office. Several future visits to respondent's office were necessary. Prior to the May 20, 1991 audit, by letter dated May 16, 1991, the OAE instructed respondent to submit a reconstruction of his trust account records, along with quarterly reconciliations as of certain specific dates. Respondent then engaged an accountant, Earl J. Kelly, to prepare the appropriate trust records and the quarterly trust account reconciliations. According to respondent, his accountant worked in conjunction with the OAE during the entire summer of 1991, in order to reconstruct his attorney records. After certain deficiencies were identified, respondent replenished the trust account by depositing $9,168.47 into his trust

account on September 24, 1991. After a thorough review of the reconstructed records, the OAE determined that they were in compliance with *R.* 1:21–6.

On October 11, 1991, respondent finally sent the $1,300 settlement to Hoffman. According to respondent, he delayed sending the funds to Hoffman until his accountant had completed his trust account reconciliations.

In the interim, however, the $1,300 was not kept inviolate in respondent's trust account. Approximately two weeks after the July 30, 1990 deposit of the $1,300 check in his trust account, respondent invaded those funds. He did so by issuing trust account checks in excess of its available balance. Specifically, on August 13, 1990, respondent's trust account balance was $2,523.54, including the $1,300 *McCracken* funds and $1,223.54 in other funds. On that date, two trust account checks totalling $2,620 were presented for payment: check No. 4337, in the amount of $120, payable to "Clerk–U.S. Bankruptcy Court," and check No. 4339, in the amount of $2,500, payable to "Prudential Hillcrest Homes" ("Hillcrest"). On that date, August 13, 1990, there were no funds on deposit standing to the credit of Hillcrest. Respondent personally issued both checks, which were unrelated to the *McCracken* matter. After those checks were cashed, the trust account became overdrawn by $121.46 and the $1,300 *McCracken* funds were invaded.

By letter dated August 14, 1990, the bank in which respondent kept his trust account notified the OAE of the $121.46 overdraft. The bottom of that letter indicated that a copy had been sent to respondent. Although respondent acknowledged having received a copy of the bank's notice, the record is not clear as to the exact date on which he received it.

On August 14 and 17, 1990, respondent deposited $2,500 and $3,047 in his trust account, respectively. On August 17, 1990, the trust account balance was $5,425.54, including the replenished $1,300 *McCracken* funds and $4,125.54 in other funds. On that same date, however, respondent issued three checks totalling $4,500, which were unrelated to the *McCracken* matter: check No. 4340, in the amount of $500, payable to "W. Lundgraf;" check No. 4341, in the amount of $3,500, payable to "Fred and Marsha Johnson;" and check No. 4342 in the amount of $500, payable to "W.L. Roth, Esq." After the payment of those checks on August 17, 1990, the balance in the trust account dropped to $925.54. Once again, the $1,300 *McCracken* funds were invaded.

Respondent testified that he had no knowledge regarding the trust account balances on either August 13 or August 17, 1990.

Q. What was your balance in your trust account right before you wrote [check no. 4337 and check no. 4339]?

A. I don't know.

Q. When was the last time before you wrote these two checks that you checked on what your balance was in your trust account?

A. I haven't the faintest idea, could have been up to a year.

Q. When you wrote these two checks what did you think was the balance in your trust account?

A. I have no idea.

\* \* \* \* \* \* \* \*

Q. [T]hree days after you had bounced a check on your trust account and you had made certain deposits in the three days there and then you wrote out checks totalling [$]4500, do you have any idea what you thought your trust account balance was on the 17th when you wrote this check, when you wrote this series of checks?
A. No.

Respondent asserted that the misappropriation of the *McCracken* funds was negligent and attributable to respondent's failure to keep client ledger cards adequately and to reconcile the trust account with bank statements. Respondent testified that "[n]obody" had kept the ledger cards up-to-date and that he had attempted no "monthly, weekly or quarterly reconciliations of trust accounts versus trust balances," despite having received a letter in 1988 from the OAE indicating record-keeping deficiencies. Donna McClintock, who served as respondent's paralegal and legal secretary before she had left his employ in January 1990, described the state of respondent's business records as "a mess" because "[t]hey hadn't been kept current for one thing, we were so far behind." Jeanine Verdel, an investigative auditor for the OAE, testified that on May 20, 1991, she had discovered respondent's trust records to be "[i]n disarray" and had verified that at one meeting with respondent, she had "actually opened some trust account bank records that had sat around and hadn't been opened for several months."

Respondent offered evidence to suggest that his ability to perform routine legal duties, such as the maintenance of client trust records, had been adversely affected by his mental condition and ongoing familial difficulties, including the tragic death of his mother and the break-up of a lengthy marriage. Respondent presented the testimony of psychiatrist Dr. Houseknecht, who initially had treated respondent on June 27, 1989, and was continuing to treat respondent for "major depression" at the time of both the misappropriations and the hearing before the Special Master in January 1994. Dr. Houseknecht was asked: "Would you find it unusual, Doctor, that [respondent] would have problems keeping

track, under his circumstances, of deposits and withdrawals of monies into certain bank accounts?" He responded: "No." Dr. Houseknecht further testified:

Q. Would it be consistent with [respondent's] treatment and his diagnosis that [respondent] would make a deposit, forget that he made a deposit several days later?

A. It would be consistent.

Q. Would it be consistent with your knowledge of his condition and your treatment of him that [respondent] would make a deposit and forget to make a withdrawal?

A. It would be.

Q. And what if the reverse were true, that he would make a withdrawal and forget to make a deposit?

A. Yes.

Dr. Houseknecht characterized respondent's volitional "capacity to act on what he knows" as the "major defect in [respondent's] illness" insofar as respondent "knew what he should do and he knew he wasn't doing it but his ability to control that was impacted or impaired by his depression." In the course of treating respondent, Dr. Houseknecht prescribed Norpramin, an antidepressant, Prozac, an antidepressant, and Trilafon, a "major tranquilizer." Dr. Houseknecht, in a treatment note dated August 2, 1990, described respondent as "pretty heavily slugged," meaning sedated and lacking alertness due to the dosage of Trilafon. In early 1991, respondent sought Dr. Houseknecht's assistance in continuing outstanding trial matters, and Dr. Houseknecht provided letters to the court requesting that respondent be granted medical leave "to allow sufficient recovery from his depressive illness."

As noted above, after reconstruction of his trust records and identification of certain deficiencies, respondent replenished the trust account by depositing $9,168.47 into the account on September 24, 1991. After reviewing respondent's records, the OAE determined respondent to be in compliance with *Rule* 1:21–6. Respondent's prognosis concerning his depressive illness is considered "good," although periods of relapse have occurred.

## B

Summarizing the *Four Seasons* matter, the DRB found the following facts:

On November 9, 1990, respondent received an $8,000 check from his client, Four Seasons. On that same day, respondent deposited the check into his trust account. Also on that day, without first waiting for the $8,000 check to clear, respondent issued a $4,000 check to himself, representing his fee in the *Four Seasons* matter. After this $4,000 withdrawal, the *Four Seasons* balance was reduced to $4,000, assuming of course that the $8,000 check would eventually clear. On November 13, 1990, respondent deposited $8,159.56 of his own monies in his trust account in behalf of *Four Seasons*. That deposit was a personal loan from respondent to *Four Seasons*. According to respondent, Chris Williams, a principal of *Four Seasons*, had asked respondent for a loan, to which he had agreed. The proceeds of that loan had come from an IRA that respondent had previously cashed and deposited into his trust account, instead of in his business account, in order to avoid an IRS lien. (The IRS had, on prior occasions, asserted a lien on respondent's business account as a result of outstanding payroll taxes.) Assuming again that the initial $8,000 check from *Four Seasons* would clear, after that $8,159.56 deposit the *Four Seasons* balance was increased to $12,159.56. On November 15, 1990, respondent wrote a check for $6,159.56 to Chris Williams, thereby reducing the *Four Seasons* balance to $6,000. However, on the next day, November 16, 1990, the $8,000 check given to respondent by *Four Seasons* bounced. Accordingly, instead of having a $6,000 positive balance, the *Four Seasons* account was actually overdrawn by $2,000.

The record is not entirely clear as to the precise date on which respondent learned of the return of the $8,000 check for insufficient funds. Respondent was not sure whether he had opened the envelope containing the bank's notice of the overdraft on the same day he had received it or "weeks later." He assumed, however, that he had opened the mail on the same day he had received it, which would have been "several days" after November 16, 1990, the day the check was returned.

Respondent did not redeposit the $4,000 fee in the trust account, upon being notified of the overdraft. According to the OAE investigator, Jeanine Verdel, respondent told her that he was unable to return the $4,000 fee paid to himself on November 9, 1990, because he had used it to pay personal expenses.

Respondent testified to a different explanation why he had not reimbursed the overdrawn trust account with the $4,000 he had previously taken as a fee:

Q. When the check of [$]8,000 came back did you ever reimburse the $4,000 you took as a fee?

A. No, because—the answer is no.

Q. And why didn't you do that at that time?

A. Well, first off, I wasn't sure exactly how much it was because I had put my money in there and I still had a couple thousand of my money left so I wasn't quite sure how much I was out because I wasn't—I didn't have the records.

Q. What was the status of the trust records at that point in time?

A. Most—not most, a good portion of bank statements were unopened, hadn't been reconciled in a couple years, there basically had been no records kept since Donna [McClintock] had left.

Respondent candidly acknowledged that he eventually had become aware that the client trust account had been overdrawn. However, he testified that his depressive illness had frustrated his ability to volitionally undertake steps to replenish the trust account.

Q. Did you know at some point in time at that point that the trust account was then running short of funds, that you had overdrafted the trust account?

A. Yeah.

Q. What steps did you take at that point?

A. I didn't really take any steps.

Q. Why?

A. I couldn't do it.

\* \* \* \* \* \* \* \*

Q. Why couldn't—

A. All I had to do—I could have had it fixed in ten seconds, all I had to do was pickup the phone and call my father.

Q. Why didn't you do that?

A. I don't know.

\* \* \* \* \* \* \* \*

Q. Were you on medication at that point in time?

A. Yes.

Q. What impact was the medication having on you, if any?

A. I don't remember too much of that time. The medication—I was feeling pretty beat up, the medication wasn't great.

\* \* \* \* \* \* \* \*

Q. At any time during the periods that have been set forth in the complaint were you aware that you were invading trust funds of clients?

A. The only time I could truly say that I would have been aware of it would have been on the [Four Seasons] matter.

\* \* \* \* \* \* \* \*

Q. What action did you then take to correct that?

A. I didn't take any action.

Q. During this period of time were you under the treatment of Dr. Houseknecht?

A. Yes.

Q. How would you characterize your day-to-day operation of your business affairs?

A. I didn't operate, I just sat back and let it sort of operate itself, and not very well.

Although it remains unclear from the record, respondent was aware presumably of the invasion of client funds in November 1990 when the *Four Seasons* check had bounced. No action was taken by respondent until May 1991 when the OAE instructed respondent to submit a reconstruction of his trust records. Respondent testified that "[a]fter ethics got done we got the account totally reconstructed and then I was told it's short X, I put it in." On August 30, 1991, apparently after his accountant had completed the mandated reconciliation of his trust records, respondent replenished the invaded client trust funds by depositing $1,967.28 in his trust account.

## C

Prudential–Hillcrest Homes Realty (Hillcrest), a real-estate agency, was owned by respondent's father, who had purchased the business at the suggestion of respondent. However, respondent's mother obtained her broker's license and took an active interest in the business, such that the business "really became hers." A review of the record does not indicate if respondent was the attorney for the business. The DRB summarized the relevant facts of the *Hillcrest* matter:

It is clear, however, that, on May 25, 1990, respondent issued trust account check No. 4318 to Hillcrest, in the amount of $7,500. At that time, which was approximately four weeks after the death of respondent's mother, there were no corresponding funds on deposit standing to the credit of Hillcrest. As of May 25, 1990, respondent's trust account balance was $9,278.83, an amount that was $124.47 short of the funds respondent should have had on deposit for the benefit of nineteen other clients. On May 29, 1990, when the $7,500 check was cashed, those client funds were substantially invaded.

On questioning by the Special Master, respondent recalled the circumstances surrounding the writing of the check:

It's in the middle of the day, the broker from Hillcrest comes over and says [,] I'm going to have to pay bills tomorrow; now, I've got a choice, my dad is in bad shape, I can pickup the phone * * * and say[,] dad, hop in your truck and get a check up here for [$]7500 or I can hand the check over, go home that night, pick the proper moment to tell him, he'll write it, bring it up, put it in the bank and the money is never out of the account, for whatever reason, I did not do that.

Respondent acknowledged that when he had written the check for Hillcrest, he had "probably believed that there was nothing there" to support the disbursement for that client. However, respondent testified that "it was my intention that the check was not to be presented until I had placed my father's check in the account and I, for whatever reason, did not follow through." Respondent stated, "If I had carried through and done what was available and what should have been done when the check was presented to my bank, the funds would have been there, collected." Respondent did not recall how the check had been transmitted to Hillcrest, stating he was unsure about whether he had "delivered it or [ ] put it in an envelope for somebody to pickup," but he testified that the check had been cashed "[b]ecause I didn't tell him not to, I just forgot about it." Respondent stated that "months later, the [$]7500, months later it just hit me and * * * I said I wrote that check and I went to my father, I said I have to put [$]7500 in that I gave Hillcrest, he gave me it immediately, I put it in." Respondent's father had loaned respondent substantial sums of money in the past, and testified that he had possessed the financial capacity to provide his son sums of monies in excess of $7,500. On August 24, 1990, approximately three months after respondent had issued to Hillcrest the $7,500 trust-account check, he replenished the trust account.

## D

The final allegation of a knowing misappropriation of client funds concerns the *$10,000 Loan* matter. The DRB summarized the essential facts:

On January 7, 1991, respondent deposited $10,000 in his trust account, which he identified as a loan from his father. According to respondent, he did not deposit

the $10,000 loan in his business account because he feared that the IRS would assert a lien against it.

On February 15, 1991, respondent issued trust account check No. 4427, in the amount of $8,000, against the $10,000 deposit. Eleven days later, on February 26, 1991, he issued trust account check No. 4428, in the amount of $3,000, also against the $10,000 deposit. Both checks were made payable to cash. The checks were then deposited in respondent's business account to cover overdrafts that occurred on February 14 and February 25, 1991. Because, at the time that respondent issued those two checks, he had no fees or other monies in the trust account to which he was entitled, client funds were invaded to the extent of $1,000.

Respondent testified that "[w]hen I issued the second check I didn't recall what I had issued the first check for" and therefore exceeded by $1,000 the $10,000 deposited in the trust account. Respondent explained that he had written "the checks against it of the money * * * that was loaned to me and for whatever reason I didn't have any records of it, I didn't have any sheet for it, that sheet was made up later and I miscalculated. I don't know if I didn't remember what the first one I wrote was or how much was put in * * *." Respondent corrected the shortage and replenished the trust account on the reconstruction of his trust-account records.

## II

With respect to the *McCracken* matter, the DRB concluded that "[t]here is no question that the *McCracken* funds were invaded on August 13, 1990, when, after the $120 and the $2,500 checks were cashed, respondent's trust account became overdrawn." The DRB noted respondent's assertion that the invasion of client funds had been unintentional, as respondent allegedly had been unaware of the trust-account balance on August 13, 1990, because his attorney-trust-account records had not been reconciled since his secretary had left his office in January 1990. However, the DRB reasoned that "even if one believes respondent's contention that the first invasion of the *McCracken* funds, on August 13, 1990, was not knowing because he had 'no idea' what his trust account balance was on that date," respondent nevertheless "had to know, on August 17, 1990, when he issued three checks for $4,500, that

his trust account balance was insufficient to cover those checks and, at the same time, keep the $1,300 *McCracken* funds inviolate." The DRB concluded that respondent knowingly had misappropriated client funds, and therefore must be disbarred:

Respondent had to know that because, on August 14, 1990, he received the bank's notice of the $121.46 overdraft of August 13, 1990, deposited $2,500 and $3,047 in the account on August 14 and August 17, 1990, respectively, and then wrote three checks for $4,500 against a $5,425.54 balance that should have included the $1,300 *McCracken* funds. As noted above, after the $4,500 checks were cashed, the trust account balance dropped below $1,300 (to $925.54). The conclusion is, thus, inescapable that respondent knew that he was invading the $1,300 *McCracken* funds when he issued the $4,500 checks on August 17, 1990.

In the *Four Seasons* matter, the DRB noted that no allegation existed that respondent had continued to write checks against the *Four Seasons* account after November 16, 1990, despite his knowledge of the return of the $8,000 check, but rather it found it to be "respondent's failure to replenish the account within a reasonable period of time" that constituted the knowing misappropriation. Respondent did not replenish the trust account until August 30, 1991, nine months after the misappropriation. The DRB rejected respondent's explanation that he had failed to replace promptly the missing fees because he had been unaware of the amount of the negative balance, stating, "There is no justification for his failure to deposit a sum sufficient to cover the trust account shortage. In fact, a deposit of $8,000, the amount of the dishonored check given by his client, would have shown a good faith effort on his part." The DRB concluded "that respondent's failure to return trust funds to his trust account for a period of nine months constituted knowing misappropriation," and therefore mandated disbarment.

The DRB characterized the *Hillcrest* matter as "[r]espondent's most glaring act of knowing misappropriation" warranting disbarment. Respondent drew a check for $7,500 from his trust account to pay for Hillcrest's business expenses despite knowing "that there were no corresponding funds standing to the credit of Hillcrest." The DRB recognized that respondent had testified that he had intended that the check "not be presented to the bank

until he talked to his father and asked for a check to be deposited into his trust account," but likewise noted that "for whatever reason" respondent had failed to fulfill that intent. Moreover, respondent did not replenish this invasion for three months. The DRB found the evidence to be "clear and convincing that respondent knew that he was invading other client funds when he drew the $7,500 check."

The DRB concurred in the judgment of the Special Master that the evidence did not clearly and convincingly demonstrate that respondent knowingly had misappropriated client funds in the *$10,000 Loan* matter. The DRB found respondent's testimony "plausible," in that he "did not recall the amount of the loan from his father or the amount of the first check, when he issued the second check." Finally, the DRB concluded that clear and convincing evidence to support a finding that respondent misrepresented facts to the OAE was lacking.

Three members of the DRB recommended that respondent be suspended for six months. Those members believed that the evidence did not clearly and convincingly establish that respondent knew he had invaded client funds in the *McCracken* matter because of "his sloppy recordkeeping practices." Those members further believed that a nine-month delay in replenishing the funds in the *Four Seasons* matter was not unreasonable in light of evidence suggesting that respondent had been awaiting the completion of the reconciliation of his trust records to determine the amount of the missing funds. Finally, those members asserted that respondent's conduct in the *Hillcrest* matter was not consistent with the state of mind associated with a knowing misappropriation of client funds.

### III

Knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986).

Misappropriation includes "not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson,* 81 *N.J.* 451, 455 n. 1, 409 *A.*2d 1153 (1979). The motive of the lawyer is irrelevant in determining the appropriate discipline for knowing misappropriation. *In re Warhaftig,* 106 *N.J.* 529, 533, 524 *A.*2d 398 (1987).

This Court consistently has held that the "principal reason for [attorney] discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers," *In re Wilson, supra,* 81 *N.J.* at 456, 409 *A.*2d 1153, and "[i]n pursuit of this goal, we have felt compelled to impose strict sanctions for the intentional misuse of clients' trust accounts." *In re Orlando,* 104 *N.J.* 344, 350, 517 *A.*2d 139 (1986). Almost invariably, when an attorney knowingly misappropriates funds of a client, that attorney is disbarred. *See, e.g., In re Barlow,* 140 *N.J.* 191, 195, 657 *A.*2d 1197 (1995); *In re Davis,* 127 *N.J.* 118, 127, 603 *A.*2d 12 (1992); *In re Rogers,* 126 *N.J.* 345, 355, 599 *A.*2d 141 (1991); *In re Noonan, supra,* 102 *N.J.* at 159–60, 506 *A.*2d 722. Since this Court announced the bright-line *Wilson* rule in 1979, "we have not retreated one bit from the principle that knowing misappropriation ... will warrant the *Wilson* sanction of disbarment," *In re Konopka,* 126 *N.J.* 225, 228, 596 *A.*2d 733 (1991), and have repeatedly rejected opportunities "to create exceptions to the *Wilson* rule, even where the misappropriation was the product of severe personal and financial hardship." *In re Warhaftig, supra,* 106 *N.J.* at 535, 524 *A.*2d 398. We continue to remain "convinced that nothing less will be consistent with our view of the devastating effect of misappropriation on the public's confidence in the bar and in this Court." *In re Hahm,* 120 *N.J.* 691, 697, 577 *A.*2d 503 (1990).

However, because of the rigid inflexibility of the *Wilson* rule and our recognition of the permanency of disbarment, we have demanded clear-and-convincing evidence that the attorney misappropriated the client's funds knowingly. *See In re LaRosee,* 122

N.J. 298, 310, 585 A.2d 326 (1991); *In re Librizzi*, 117 N.J. 481, 490, 569 A.2d 257 (1990); *In re Gallo*, 117 N.J. 365, 372, 568 A.2d 522 (1989); *In re Perez*, 104 N.J. 316, 324, 517 A.2d 123 (1986). "This high standard emphasizes the reluctance which should characterize a decision to impose a disciplinary sanction and the serious consequences which attend such a decision." *In re Sears*, 71 N.J. 175, 197–98, 364 A.2d 777 (1976).

Based on our independent review of the record, we conclude that the totality of the circumstances demonstrates clearly and convincingly that respondent knowingly misappropriated his clients' funds. The line between knowing misappropriation and negligent misappropriation is a thin one. "Proving a state of mind—here, knowledge—poses difficulties in the absence of an outright admission." *In re Johnson*, 105 N.J. 249, 258, 520 A.2d 3 (1987). However, this Court has noted that "an inculpatory statement is not an indispensable ingredient of proof of knowledge, and that circumstantial evidence can add up to the conclusion that a lawyer 'knew' or 'had to know' that clients' funds were being invaded." *Ibid.* In this case, that circumstantial evidence includes repeated invasions of client funds that were required to be held inviolate. The testimony adduced convincingly suggests that respondent "knew," or "had to know" that he was invading client funds.

In the *Hillcrest* matter, respondent admitted that he had "probably believed that there was nothing there" to support the disbursement of $7,500. Nevertheless, he wrote the check. Respondent contends, however, that he had intended to recover the funds before the check had been presented for payment, but had failed to follow through. Regardless of the questionable nature of that practice, respondent had to know that unless he were to cover that check, clients' funds would be substantially invaded. The failure of respondent to deposit funds sufficient to cover the check inevitably resulted in the invasion of the trust account and constituted knowing misappropriation. Respondent's explanation that he failed to ask his father for the money on the day he wrote the

check because his father was in "bad shape" might be plausible, but it cannot possibly justify respondent's failure to replace the funds for approximately three months.

Respondent likewise knew that he had invaded clients funds in the *Four Seasons* matter. Respondent fully admitted that on return of the client's check for insufficient funds on November 16, 1990, he had been aware that he had invaded trust account funds by issuing himself a check for payment of fees on November 9, 1990. Nevertheless, respondent claims that he took no action to replenish the deficit for a period of nine months because he "wasn't sure exactly how much it was," apparently because he was awaiting the reconciliation of his trust account. However, although the invasion had occurred in November 1990, respondent was not ordered by the OAE to undertake a reconciliation until May 1991. In the interim, respondent did nothing. Despite an admitted knowledge that his trust account was in disarray, respondent consistently failed to adhere to acceptable trust-account management practices and failed to implement procedures to guard sufficiently against future invasions. "As fiduciaries, lawyers are obliged to know whether their trust accounts are in balance." *In re Bell*, 126 *N.J.* 261, 266, 596 *A.2d* 752 (1991). Respondent knew that his trust account procedures were lacking, but did not rectify them. "Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds." *In re Fleischer*, 102 *N.J.* 440, 447, 508 *A.2d* 1115 (1986). Respondent knew that he had violated that duty, was aware that his trust account had been invaded, and was aware that the disorder of his trust account records did not provide a guarantee against future invasions, but knowingly failed to undertake any corrective action.

Finally, the *McCracken* matter provides strong circumstantial evidence that respondent knew that he was invading client trust funds. Respondent, by issuing a check for $2,500 to a client, Prudential Hillcrest Homes, who had no funds standing to its credit, invaded his trust account on August 13, 1990. The bank

notified respondent that the trust account was overdrawn on August 14, 1990, and respondent deposited a check for $2,500 on the same day. Respondent claims that he did not realize that the $2,500 check he had recently issued "was the cause of the overdraft," and insisted that no connection existed between the issued check and the subsequent deposit for the same amount. Three days later, respondent invaded the trust account again. The chronology clearly suggests that the deposited check on August 14, 1990, had been intended to replenish the overdrawn trust account and was not mere coincidence. Respondent must have known three days later that he was invading the trust account again.

Respondent has offered the defenses that his "shoddy bookkeeping," his depressive state of mind, and simple forgetfulness, combined to obscure his knowledge that his client trust account had been invaded on several occasions. Regarding the *McCracken* matter, respondent testified that he had not known the balance in his trust account on August 13, 1990, before issuing two checks that had invaded the trust funds of clients. Moreover, despite strong evidence that respondent subsequently received notification that his trust account had become overdrawn, and after apparently replenishing that deficit by depositing a check, respondent invaded the trust account again days later. Respondent testified that although he had been aware that he had invaded client funds in the *Four Seasons* matter, he had been incapable of rectifying the overdraft, both because of his mental state and because of his inability to identify the amount of the shortage. Finally, respondent admits that he knew that adequate funds to support the disbursement in the *Hillcrest* matter were lacking, but that he intended to receive money from his father to cover the check and "for whatever reason, did not follow through." In rejecting respondent's defenses, we acknowledge that the cumulative effect of respondent's multiple invasions of clients' trust-account funds diminishes the persuasiveness of any of respondent's proffered explanations or justifications. The record clearly and convincingly

demonstrates that respondent believed that he could treat clients' funds as if they were his own.

Finally, we have reviewed the psychiatric testimony offered by respondent. Although the expert testimony suggests that respondent lacked the volitional capacity to fulfill effectively his duties as an attorney, the testimony does not suggest that "respondent suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing." *In re Jacob,* 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984). Respondent was suffering from depression resulting from the break-up of his marriage and the tragic death of his mother. However, no indication exists that "respondent could not distinguish between right and wrong or that he did not understand the nature and quality of his acts." *In re Baker,* 120 *N.J.* 496, 504, 577 *A.*2d 158 (1990). Respondent's defense does not go far enough. "Respondent candidly admitted that he understood the situation. He fully knew and understood that when he invaded his trust accounts, the funds he was taking were not his." *Id.* at 505, 577 *A.*2d 158. Even if we were to acknowledge that the testimony of respondent's psychiatrist might diminish the impact of respondent's failure properly to manage his trust account, respondent's misappropriation in the *Hillcrest* matter could not be explained on the basis of trust-account mismanagement. That invasion of trust funds was intentional when it occurred, and respondent's contention that he simply forgot to replace the funds is not credible.

We are mindful of the adversity respondent has endured and the difficulties he continues to struggle to overcome. However, the testimony does not demonstrate a loss of comprehension sufficient to explain or excuse his knowing acts of misappropriation.

We conclude that the appropriate discipline is disbarment. Respondent is directed to reimburse the Ethics Financial Committee for appropriate administrative costs.

O'HERN, J., dissenting.

Three members of the Disciplinary Review Board (DRB) voted for a six-month suspension of respondent, rather than disbarment. Those members believed that the proofs did not clearly and convincingly establish that there had been a knowing misappropriation of clients' funds within the meaning of *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979). I agree with the dissenting members of the DRB and do not vote to disbar the respondent.

The crucial issue is the claimed misappropriation of the *Hillcrest* funds. Respondent testified that in May 1990 he drew a $7,500 check from his trust account to cover expenses of his father's real estate business. He intended to obtain the funds from his father that same evening before the check was presented for payment. Respondent's failing was not that he was venal, but that he did not bring himself to discuss the cover of the check with his father while his father was mourning the loss of his wife. As respondent explained the situation:

> It's in the middle of the day, the broker from Hillcrest comes over and says I'm going to have to pay bills tomorrow; now, I've got a choice, my dad is in bad shape, I can pickup [sic] the phone, this is the way I'm reconstructing it, I can pickup [sic] it again and say dad, hop in your truck and get a check up here for $7500 or I can hand the check over, go home that night, pick the proper moment to tell him, he will write it, bring it up, put it in the bank and the money is never out of the account, for whatever reason I did not do that.

Thus, when respondent drew the check he did not know that there would be an invasion of client funds. He believed the check would be covered. When he went to his father's home that evening to get the covering check from his father (who was fully able to cover the $7,500), he found his father in a disconsolate state over the recent, tragic death of his wife in an automobile accident. For whatever reason, sympathy or his own grief over his mother's death, respondent did not attend to business. He never found "the proper moment." Did that display of humanity make Walter Roth a thief? There must be more to the *Wilson* rule than this. Yes, respondent waited several months to correct the situation, but he, too, was in the grips of a deep depression, not induced solely by the death of his mother, but surely not

alleviated by it. As his associate from 1986 to 1989 explained: "[A] lot of times [respondent] would sit in his office with just a banker's lamp on, not the overhead lights, just sit and stare off into space * * *."

Insistence on proof that an attorney's

personal suffering *caused* him to misappropriate funds is both unrealistic and pointless. Our human experience is sufficient to infer a relationship between severe personal stress and acts of imprudence or even desperation. The question should not be one of causation, but rather whether our disciplinary system is sufficiently flexible in unique circumstances to temper the imposition of discipline by taking into account the influence of extraordinary events.

[*In re Bell,* 126 *N.J.* 261, 269, 596 *A.*2d 752 (1991) (Stein, J., concurring in part, dissenting in part).]

It should so be in this case as well. The confluence of human events—the death of a mother, the grief of a father, the depression of the respondent—should be taken into account, especially considering that no client suffered any loss on account of respondent's conduct.

*For disbarment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—6.

*For suspension*—Justice O'HERN—1.

### ORDER

It is ORDERED that **WALTER L. ROTH, JR.,** of **PITMAN,** who was admitted to the bar of this State in 1979, be disbarred, effective immediately; and it is further

ORDERED that respondent's name be stricken from the roll of attorneys and that he be permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **WALTER L. ROTH, JR.,** pursuant to *Rule* 1:21–6, shall be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of

the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.